**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 96-10255

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MICHAEL A. GROSSMAN,

Defendant-Appellant.

Appeal from the United States District Court
For the Northern District of Texas

July 8, 1997

Before DAVIS, STEWART and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellant Michael A. Grossman was convicted after a jury trial of one count of conspiracy to commit wire fraud and to make false entries into the records of a savings and loan in violation of 18 U.S.C. § 371 and eleven counts of wire fraud in violation of 18 U.S.C. § 1343. Appellant was sentenced to three years in prison, to be followed by five years of probation, and ordered to pay restitution of $5 million. He appeals.

1

I. FACTS

Michael Grossman was a Dallas, Texas real estate attorney and investor who, in partnership with his father Martin Grossman, purchased distressed properties, turned them around and sold or managed them at a profit. They had extensive real estate holdings and one of their companies, M&G Management Co., Inc. ("M&G"), managed approximately twelve hotels in Texas, Louisiana and Oklahoma. In January 1987, Michael Grossman's net worth, according to one estimate, was over $49 million.

Heritage Savings and Loan Association ("Heritage") was a state chartered savings and loan association located in Elk City, Oklahoma, the deposits of which were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). Richard Armstrong was the president of Heritage and owned approximately 11 percent of its stock. Initially, most of Heritage's loans were on single-family residences. When the oil and gas market declined in western Oklahoma, many of these home loans went into default and Heritage began experiencing net worth problems.

In March 1984, Heritage made a $10 million loan on a project in Edmond, Oklahoma known as "the Oaks." The plan was to develop and construct 92 luxury condominium town homes around a golf course, clubhouse, swimming pool and tennis court. The loan went into default after fourteen units were built and Heritage accepted a deed-in-lieu of foreclosure in settlement of the borrower's debt. The Oaks, the largest piece of real estate owned ("REO") by Heritage, lost $569,000 in 1984 and over $8 million in 1985, and

2

was a significant drain on the institution.

On December 31, 1985, H. George Schuler purchased all of the outstanding stock of Heritage for $3.4 million. Schuler deposited about $1.7 million into Heritage as a capital contribution and another $1.7 million into an indemnification account for the benefit of the selling shareholders. That account was pledged to Heritage as a guaranty against certain carrying costs and specified losses, including those associated with the Oaks project. Upon the sale of the Oaks, any funds remaining in the account would be distributed to the former shareholders.

The accounting for the sale of Heritage to Schuler utilized a method called "push down accounting." Ordinarily, when a bank forecloses on property, it is put on the books at the lower of the original loan balance or the appraised value at the time of foreclosure. "Push down" accounting, however, enabled Heritage to obtain a new appraisal on the Oaks for $5.7 million as of Schuler's acquisition date and adjust the value on the institution's books downward to reflect this value. As a result, if the Oaks sold for more than $5.7 million, Heritage would be able to recognize a gain on the sale and improve its capital position.

Heritage's initial efforts to sell the Oaks were unsuccessful and its financial condition continued to deteriorate through the first five months of 1987. The Federal Home Loan Bank Board ("FHLBB") was closely monitoring the situation at the institution and was considering imposing a supervisory agreement that would restrict lending operations if the deficiency was not corrected.

3

In March 1987, Michael Grossman was approached by Craig Glendenning, who was associated with a real estate company called Craig Properties. At that time, Michael Grossman believed the real estate market had bottomed out and wanted to buy some properties while the prices were low. Glendenning introduced Michael and Martin Grossman to Armstrong and Schuler. At the initial meeting, one of Craig Properties' principals proposed that Heritage sell the Oaks to the Grossmans and afterwards provide a $15 million basket of loans to them. Michael Grossman made four trips to the site, and determined that he could be successful with it. He was told that Heritage had $10 million in the property and had an appraisal at $8.5 million. After a series of negotiations, the Grossmans agreed to make a $1.5 million down payment and purchase the Oaks for about $8 million. In exchange, Heritage committed to fund a $15 million basket of loans to the Grossmans and their related entities, subject to normal underwriting requirements. Michael Grossman told Glendenning that he wanted to borrow the funds for the down payment, so Glendenning introduced him to Addison Terry, a loan broker from Houston, Texas.

Terry arranged for the Grossmans to borrow the down payment from Louisiana National Life Insurance Company. The Grossmans personally guaranteed repayment within 60 days and agreed that when Heritage funded additional refinancing loans for their properties, a portion of the proceeds would be disbursed by the title company to the Addison Terry Company and applied to the repayment of the $1.5 million loan. Heritage's records clearly revealed that the

Grossmans were borrowing the money for the down payment from Terry and that monies from the basket of loans would be used to repay him. There was testimony that Heritage's board and the FHLBB were not "informed" that the down payment was borrowed, but Michael Grossman had no contact with either the board or the regulators.

In addition to borrowing the $8.2 million to purchase the Oaks, the Grossmans eventually made four other loans from Heritage's "basket of loans," one before the Oaks closing, and three after:

| | | |
|---|---|---|
| Valley Towers | $850,000 | on 6/26/87 |
| The Oaks | $8.2 million | on 7/02/87 |
| Oklahoma City | $1.85 million | on 7/27/87 |
| M&G | $1.35 million | on 7/30/87 |
| Duro | $2.7 million | on 9/04/87 |

Heritage also funded loans to two individuals, B. J. Hayes and Jay Saldi, at the end of July 1987 to enable them to purchase town homes in the Oaks. Glendenning provided the money for their down payments and paid each one $5000 for participating in the transactions. Neither Hayes or Saldi ever lived in the town homes. Michael Grossman agreed to lease their town homes for use as model homes and to provide full payment of their mortgages. Hays defaulted on his loan in January 1988 when Michael Grossman stopped making lease payments to him. Saldi also defaulted on his loan.

Finally, Martin Grossman purchased two town homes at the oaks and received a loan in the amount of $524,500 from Heritage. His down payment was funded with $59,000 from the proceeds of the Oklahoma City loan. There were no other units sold at the Oaks.

By the fall of 1987, there were disputes between the Grossmans

5

and Heritage concerning continued funding of the basket of loans. In late October, Grossman's loans became delinquent and Heritage refused to fund any more loans. The parties discussed rescinding the transactions but never received the requisite approval from the FHLBB. None of the loans -- the Oaks, the basket of loans or the townhouse loans -- were repaid.

In January 1995, bankers Schuler and Armstrong, real estate agent Glendenning and purchasers Michael and Martin Grossman were indicted on twelve counts of conspiracy and wire fraud in connection with these transactions. Schuler and Glendenning pleaded guilty and received probation. Armstrong and Michael Grossman were convicted on all counts. Martin Grossman was acquitted on all counts. Michael Grossman and Armstrong appealed, but Armstrong, after pleading guilty in an unrelated case, withdrew his appeal.

## II. SUFFICIENCY OF THE EVIDENCE

Michael Grossman contends that the evidence at trial was insufficient to sustain his convictions on any count. He timely filed a motion for judgment of acquittal at both the close of the government's case and at the conclusion of all of the evidence. The standard of review, therefore, requires this court to view the evidence in the light most favorable to the jury verdict and affirm if a rational trier of fact could find that the government proved all essential elements beyond a reasonable doubt. *United States v. MacKay*, 33 F.3d 489 (5th Cir. 1994). If "the evidence viewed in the light most favorable to the prosecution gives equal or near

equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed." *Id.,* 33 F.3d at 493. This court has recognized the high degree of deference accorded the jury verdict in a criminal case, terming this standard of review "imposing." *United States v. Parekh*, 926 F.2d 402, 405 (5th Cir. 1991). There are few disputes about the events that serve as the basis of Michael Grossman's convictions. Rather, the government and appellant differ concerning what conclusions can rationally be drawn from those facts concerning the parties' knowledge and intentions.

Count 1 of the indictment charged the offense of conspiracy under 18 U.S.C. § 371. To establish a conspiracy under § 371 the government must prove (1) there was an agreement between two or more persons to pursue an unlawful objective; (2) the defendant voluntarily agreed to join the conspiracy; and (3) that one of the persons committed an overt act in furtherance of the conspiracy. *United States v. Pettigrew*, 77 F.3d 1500, 1519 (5th Cir. 1996). The objects of the conspiracy set out in the indictment were to commit the offenses of wire fraud under 18 U.S.C. § 1343, aiding and abetting that offense under 18 U.S.C. § 2 and making false entries into the books and record of the savings institution in violation of 18 U.S.C. § 1006. Counts 2 through 12 of the indictment charged separate offenses of wire fraud. Specifically, they charged that the five codefendants devised a scheme and artifice to defraud and to obtain money and property from Heritage by means of false and fraudulent pretenses, representations and

7

promises by making eleven wire transfers from June 26, 1987 through September 11, 1987 from Heritage to fund the Oaks loan and the accompanying basket of loans to the Grossmans.

The conspiracy and wire fraud are based on the same alleged conduct. As set out in the indictment, that conduct consisted of:

> [] defendants H. George Schuler and Richard F. Armstrong agreed to sell the Oaks to Michael A. Grossman and Martin B. Grossman for $8,462,172 with a cash down payment of $1,500,000 and to provide additional loans [of] $15,000,000 from which the $1,500,000 would be repaid.

> [] defendants H. George Schuler and Richard F. Armstrong would artificially enhance the financial appearance of Heritage by funding the Oaks loan to defendant Michael A. Grossman.

> [] defendants Michael A. Grossman and Martin B. Grossman would submit false and fraudulent documents to defendants H. George Schuler, Richard F. Armstrong and Heritage in connection with the loans to Valley Towers, Oklahoma City Hotel Joint Venture, M & G Management, and Duro Resources, Inc.

> [] defendants H. George Schuler and Richard F. Armstrong would cause Heritage to fund the loans to defendants Michael A. Grossman and Martin B. Grossman with portions of the loan proceeds applied to the borrowed down payment and other portions of the proceeds diverted to the personal use of defendants Michael A. Grossman, Martin B. Grossman and Thomas Craig Glendenning.

> [] defendant Thomas Craig Glendenning [] solicit[ed] two nominees to purchase two townhouses located in the Oaks development from Heritage, for which he would provide the down payment.

The only conduct alleged against Michael Grossman that is inherently illegal is the submission of false or fraudulent documents to Schuler, Armstrong and Heritage. Michael Grossman's other alleged activities, while legal, were criminal to the extent that he fraudulently concealed them from Heritage.

8

The district court's charge correctly advised the jury that the offenses must have been committed knowingly and with the specific intent to defraud.  The charge stated that, to "establish specific intent, the government must prove that [Michael Grossman] knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law."  Michael Grossman contends that there was insufficient evidence of the required mental elements of the crimes alleged to sustain his convictions.

We must then examine the acts that the government relied on to establish Michael Grossman's guilt.  First, the government contended that Michael Grossman falsely represented to Heritage that the loans would be used by the named borrowers for their business and commercial purposes, then applied the funds to personal use.  Each of the loans contained the following language:

> Borrower represents and warrants lender that the loan will be used by borrower for its business and commercial purposes and not for personal, family, household or agricultural use.

This clause is the focus of the "false and fraudulent documents" allegation in the indictment.  The government contended at trial that Michael Grossman violated this clause by (1) making a $20,000 payment for his children's tuition out of a bank account where a portion of the loan proceeds had been deposited and (2) using the loan proceeds for business purposes unrelated to the business purposes of the specific entity who is named as the borrower on the particular loan in question.

As to the tuition payment, the evidence showed an account

balance of $9,308 in non-Heritage funds on June 30, 1987 when Michael Grossman wrote the $20,000 check to his household account for the tuition. A $89,040 deposit of Heritage funds was made on June 30 and posted to the account on July 1, 1987. On July 2, 1987, another deposit of $17,175 in non-Heritage funds was made to the same account. This evidence in not sufficient to sustain a conviction based on Michael Grossman's use of Heritage loan funds for personal expenses.

The second allegation requires us to determine if the evidence supports the conclusion that the Grossmans fraudulently used loan proceeds for business expenses related to projects other than the business entity named on the loan. On each of the loans in question, the borrowers were entities primarily owned and controlled by Martin and Michael Grossman. Testimony from both government and defense witnesses confirm that the parties' understanding was that the purpose of the loans was to refinance existing debt and to pull equity out of certain properties that could then be used to acquire additional properties, especially the Oaks. The Grossman's reading of the clause -- that it allowed use of the loan proceeds for business purposes related to any of their holdings -- while not the only possible interpretation of the language, was reasonable. Because everyone involved accepted this interpretation and openly acted in accordance with this understanding the alleged breach of this clause does not support a finding of fraudulent intent on the part of Michael Grossman.

Next, the government took the position that the borrowed down

10

payment is proof of fraudulent intent. It is clear that borrowing the down payment was not precluded by law nor by the agreement of the parties and that Michael Grossman fully disclosed his plan to borrow the down payment and to repay that loan with proceeds of various basket-loans that withdrew equity invested in other real estate projects. The borrowed down payment does not support the conclusion that Michael Grossman had the intent to defraud Heritage.

Next, the government alleges fraud based on language in the loan papers that provides that the loans are "separate and independent from any other transaction between Lender and Borrower. . . [n]either the Commitment to make the Loan nor the closing of the Loan is conditioned in any respect upon Borrower purchasing property or obtaining other credit or services from Lender. . . ." The government contends that these statements were false and fraudulent because each of the loans was conditioned upon the Grossmans' purchase of the Oaks from Heritage, and proceeds from the loans were used to repay the borrowed down payment on the Oaks.

The evidence showed that the "separate and independent" language is standard or "boilerplate" language in loan documents. Michael Grossman testified that he understood the language to mean that the loans were not cross-collateralized and not in violation of the Tying Act.[1] In fact, he changed the "separate and

_____

[1]The Bank Tying Act is a federal statute that permits bank customers to seek civil damages when one transaction is conditioned on the customer's willingness to complete a second transaction with the same institution. *United States v. Beuttenmuller*, 29 F.3d 973, 977 n.8 (5th Cir. 1994). "Separate and independent" language is

11

independent" language in the Oaks loan, because he understood that his purchase of the Oaks was based on Heritage's commitment to loan him the additional funds. Further, the loan papers, signed by Michael Grossman, filed with Heritage and available to the regulators make the relationship between the various transactions very clear. The evidence does not support the conclusion that Michael Grossman harbored intent to defraud or in any way mislead the bank or the regulators concerning the relationship between the loans.

Next, we must examine the allegation that Michael Grossman participated with Schuler and Armstrong in a scheme to artificially enhance the financial appearance of Heritage, by agreeing to a purchase price above the appraised value and by dating the closing documents on June 30 when the loan was not funded until two days later. The evidence uniformly portrayed the pre-purchase negotiations as to purchase price of the Oaks as legitimate, arms-length and hard fought. There is no evidence that Michael Grossman had any information that would indicate that the purchase price was fraudulently or artificially high. He testified that he believed that the Oaks, by themselves, may have had less than $10 million in value. However, he concluded that the commitment by Heritage to fund mortgage loans for Oaks town home purchasers in a tight market, the inclusion of marketing funds, as well as the advantages afforded the Grossmans by the basket of loans made the total

---

included in loan documentation to protect the bank from potential civil liability.

negotiated price a fair one.

There are two government theories as to why the jury could conclude that false entries were made on Heritage's records. First, Heritage initially booked a profit on the Oaks loan that the regulators later determined was inappropriate because the down payment had been borrowed. The evidence does not show that Michael Grossman had either knowledge about or authority to influence Heritage's decision to book a profit. Second, the closing papers were dated on June 30, 1987 and the government contends that the deal did not "really" close until two days later. The fact that the parties chose to close on June 30 in order to show the transaction on the books during the second quarter of 1987 is not evidence of illegality or fraud. Also, Michael Grossman signed the closing papers on June 30, they were dated June 30, and he left a check for $300,000 as a partial payment on that day. The evidence is not sufficient for a rational juror to conclude that Michael Grossman's actions concerning the closing date amounted to fraud.

Finally, there was evidence that Saldi and Hays were nominee borrowers and that Michael Grossman knew of and participated in the structuring of the nominee loans. Such loan structure is not illegal. Again, because there is no evidence that Michael Grossman concealed the transactions or defrauded Heritage with regard to the Saldi and Hays transactions, the fact that nominees were used does not support his convictions.

Michael Grossman emphasizes that the regulators, lawyers, accountants and bank employees "knew exactly what was going on" and

13

that he dealt honestly and openly with all of these individuals throughout the entire process. The government responds that the victim of bank fraud is the financial institution, not its officers, citing *United States v. Aubin*, 87 F.3d 141, 146 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 965 (1997). Thus, even if there was full disclosure to Heritage personnel, the savings and loan was nevertheless defrauded and Michael Grossman may be criminally liable. *Id.* In fact, *Aubin* is not only distinguishable, but highlights the inadequacies of the evidence in this case. Unlike the evidence adduced in Grossman's trial, Aubin "deliberately structured the transaction so that the loan documents would not reveal that [the purchasers] were involved in the deal." *Id.* 87 F.3d at 146. Further Aubin's co-defendant/bank officer "knew that he could not tell the members of the loan committee the truth about the transaction because they would not want to do anything that might incur regulatory scrutiny." *Id.* In contrast, the Oaks, already subject to intense regulatory scrutiny, was faced with certain closing unless it sold the Oaks very quickly. The officers, in an effort to save the institution, negotiated what everyone anticipated was a mutually beneficial deal, with acknowledged risks. Unfortunately, both Heritage and the Grossmans sustained catastrophic losses. Michael Grossman, whom the government repeatedly characterized to the jury as having more money than Heritage, risked and lost his entire fortune. But the government did not offer sufficient evidence of fraud or conspiracy by Michael Grossman against Heritage to sustain the convictions.

14

As this court has held, "[t]here is nothing unusual about people, who can economically benefit each other, getting together and constructing a mutually beneficial bargain." *United States v. Beuttenmuller*, 29 F.3d 973, 983 (5th Cir. 1994). Moreover, "no criminality can be attached to [real estate purchasers or lending institutions] because the bottom dropped out of the real estate markets. The decline of any market is part and parcel of the risks of investing." *Id.*

In sum, the government contended that Michael Grossman either committed an inherently illegal act, or lied and deceived Heritage about some otherwise legal behavior, thereby inducing Heritage to assume a risk it could have otherwise avoided. The government did not prove that Michael Grossman submitted false and fraudulent documents to Schuler, Armstrong and Heritage in connection with the subject loans. Further, given Michael Grossman's lack of concealment, the evidence in insufficient to support the mens rea element of conspiracy or wire fraud. *See United States v. Pipkin*, 1997 WL 291685 (5th Cir. 1997). We therefore reverse Michael Grossman's convictions.

REVERSED.

15