UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-41184
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAFAEL GRACIA GUERRERO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

March 10, 1999

Before GARWOOD, BARKSDALE, and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For contesting his convictions and enhanced sentences for two
bank robberies in April and May 1994, Rafael Gracia Guerrero
primarily challenges the sufficiency of the circumstantial identity
evidence linking him to the robberies; and of the evidence of
injury to security guards underlying the "bodily injury" increase
used in sentencing on each robbery.  In addition, for those
convictions and those for two related firearms counts for each
robbery, Guerrero asserts that the introduction of evidence
concerning another suspect in the robberies violated FED. R. EVID.
404(b); and that there was insufficient proof that the banks were

insured by the Federal Deposit Insurance Corporation. We **VACATE** the convictions related to the April robbery; and **AFFIRM** the conviction for the May robbery, and the convictions and sentence for the two related firearms counts. But, because the bodily injury increase for the May robbery was applied erroneously, we **VACATE** the sentence on that count and **REMAND** for resentencing.

## I.

Guerrero was charged for three bank robberies that occurred in the Brownsville, Texas, area in April and May 1994, and in January 1995. The first, on 25 April, was at the Boca Chica branch of the Texas Commerce Bank (TCB-Boca Chica). Around 7:30 a.m., bank employees Gonzalez, Thibodeaux, and Garcia unloaded the night deposit bags from a night depository located across the rear bank parking lot. After placing the funds in a container, they began to walk across the parking lot to the bank's rear entrance. Security guard Garcia, carrying the container, was between Gonzalez and Thibodeaux.

An automobile with tinted windows entered a parking spot in front of them. Two men, armed with guns and wearing sunglasses, white shirts, and dark ties and trousers, exited the vehicle and approached the group. They took the container, which held approximately $52,000, from Garcia and put it in the car. The driver then returned, took Garcia's gun and two-way radio, and hit

- 2 -

Garcia over the head with a gun, causing him to lose consciousness. The two robbers then drove quickly from the scene.

Approximately 30 months later, in November 1996, bank employee Gonzalez identified a photo of Guerrero as resembling the passenger in the robbery vehicle. At trial in June 1997, she stated that Guerrero looked like the passenger, but that she was not totally confident in her identification. Bank employee Thibodeaux testified that she did not see the passenger well enough to be able to make an identification, but that she believed he was about 5'5" tall. Garcia, the assaulted security guard, did *not* testify.

Guerrero testified that he was at work on the morning of the robbery. And, although his employer testified on his behalf, the employer admitted, *inter alia*, that there were no written records to confirm when Guerrero had worked; and that Guerrero normally worked in the evenings. Guerrero, however, testified that he sometimes began work in the early morning.

The day after the robbery, the getaway vehicle was found near the bank. In the automobile were: a radio, identified by Garcia as the one taken from him during the robbery; and a canister, like the one used to hold the money. And, fingerprints, later identified as Julio Torres', were on the vehicle's temporary paper license plate.

The second of the three robberies occurred at approximately 10:15 a.m. on 25 May 1994 at the Mercantile Bank. Villarreal, an employee of an armored car company, was exiting the bank after

picking up several bags of money, totaling $259,000.  As Villarreal returned to the armored truck, which was parked in the front bank parking lot, the male passenger of a minivan parked there emerged and put a pistol to Villarreal's head.  After Villarreal attempted to wrest the gun away, the minivan driver exited it, hit Villarreal in the back with a shotgun, and kicked him forward to the ground. The two robbers, who were both wearing sunglasses, took the money and drove off.

Approximately 30 months later, in November 1996, Villarreal picked a photo of Guerrero from a lineup.  But, at trial in June 1997, Villarreal was unable to identify Guerrero.  And, Guerrero's cousin testified that Guerrero was attending a birthday party when the robbery was committed.

A day after the robbery, the minivan was found near the bank. In the vehicle were an empty bottle and an envelope.  Fingerprints, later identified as Guerrero's, were found on both items. And, as with the automobile used in the first robbery, fingerprints, later identified as Torres', were found on the vehicle's temporary paper license plate.

The third, and final, robbery occurred on 29 January 1995 — "Super Bowl Sunday".  Ortiz and Lopez, employees of an armored car company, made several pickups of night deposits from local businesses.  Around 5:30 p.m., they arrived at the Texas Commerce Bank on Levee Street (TCB-Levee) to make a drop.  As Lopez stepped

- 4 -

out of the armored vehicle, an automobile carrying four men pulled up. Three exited with guns; the driver, who was wearing sunglasses, remained in the vehicle with his window slightly down and a gun aimed at Lopez. One man pressed a gun to Lopez's head; another removed Lopez's gun from its holster; the third entered the armored vehicle and threw bags of money into the automobile. Ortiz was told to remain still or Lopez would be killed. After the money had been unloaded, the men drove off.

Ortiz and Lopez pursued the getaway vehicle and were able to record a license plate number. Later, neither was able to identify Guerrero as one of the robbers. And, Guerrero's sister testified that he was attending a Super Bowl party at her house when the robbery occurred.

A few days after the robbery, the getaway vehicle was located in Brownsville. A fingerprint, later identified as Guerrero's, was found on the inside of the driver's side door handle.

As each getaway vehicle was discovered, it was dusted for fingerprints; FBI Special Agent Hutchinson forwarded the prints to the FBI laboratory. And, during his investigation, the Special Agent received information from confidential informants regarding suspects.

One informant provided Torres' name. Torres, whose fingerprints were later identified on the temporary paper tags for the getaway vehicles for the April and May 1994 robberies, had been

arrested soon after the first robbery on an unrelated charge and his address book photocopied. Police later discovered Guerrero's name and telephone number in the book. (Torres, however, has apparently never been apprehended for his suspected involvement in the three robberies.)

As of mid-1996, Special Agent Hutchinson had not linked Guerrero to the robberies. But, at that time, FBI Special Agent Vela was told by a confidential informant that Guerrero had been involved in them, and was an associate of persons who had also participated. After obtaining Guerrero's fingerprints and photograph, the Special Agent began to use the latter in photograph arrays.

Special Agent Vela showed the arrays to Gonzalez (a witness to the April robbery) and Villarreal (a witness to the May robbery). Both picked Guerrero's picture. Thibodeaux and Garcia (the other witnesses to the April robbery) were shown the arrays. There is no evidence pertaining to Garcia's response. Thibodeaux identified Oscar Venegas (another suspect) as the driver of the getaway vehicle. Venegas' name was also in Torres' earlier seized address book.

As a result, Special Agent Vela sent Guerrero's fingerprints to the FBI laboratory for a comparison with those found on the getaway vehicles. Guerrero's prints matched with those in two of

the vehicles (May and January); accordingly, an arrest warrant was issued in December 1996.

Several law enforcement agencies conducted surveillance of Guerrero's parents' home in Brownsville. In late March 1997, a man fitting Guerrero's description was spotted leaving that house in a pickup truck.

Two Texas Department of Public Safety (TDPS) officers stopped the truck for not having either a license plate or the required light for it. In doing so, the officers activated only the lights on their vehicle, and not the siren. Nevertheless, Guerrero exited the truck with his hands above his head. One of the officers testified that this response was unusual. Along this same line, two law enforcement officers who had contact with Guerrero the night after he was arrested and taken into custody testified that he had expressed concern regarding his wife because "she didn't know anything".

A search warrant was executed at Guerrero's residence in Brownsville, but no evidence directly connecting him to the robberies was found. At trial, the Government introduced photographs it had recovered from the home depicting Guerrero holding guns and wearing a t-shirt with the insignia of a Mexican drug enforcement agency.

Guerrero was tried in June 1997 for the robberies, and the related counts for use of a firearm during a crime of violence, for

April 1994 (counts 1-3), May 1994 (counts 4-6), and January 1995 (counts 7-9).  As noted, Guerrero testified.  And, he moved for judgment of acquittal both at the close of the Government's case and at the close of the evidence.

Before the case went to the jury, the court entered a judgment of acquittal on the counts related to the January robbery, because the Government failed to prove that the funds were in the control or custody of TCB-Levee, as required by 18 U.S.C. § 2113(f).  The court informed the jury of the reason for that ruling, but instructed the jury that, in deliberating on the remaining counts, it could still consider the evidence concerning that January robbery.  The jury returned a guilty verdict on the counts related to the April and May robberies.

The sentencing judge did not preside over Guerrero's trial. Pursuant to U.S.S.G. § 2B3.1(b)(3)(A), an increase for "bodily injury" to a robbery victim was added to Guerrero's base offense level for each of the robbery convictions.  For those two counts, and one firearms count for each robbery, Guerrero was sentenced to 397 months in prison.

## II.

Guerrero asserts that: (1) there was insufficient evidence to establish his involvement in the April and May robberies; (2) evidence regarding Torres was erroneously admitted under FED. R. EVID. 404(b); (3) the Government failed to prove that, on the dates

of the robberies, the banks were insured by the Federal Deposit Insurance Corporation; and (4) the bodily injury enhancement was not applicable.

A.

For each robbery, Guerrero was charged pursuant to 18 U.S.C. § 2113(a); for the related use of a firearm, pursuant to 18 U.S.C. § 924(c). He does not contest that the Government proved that *someone* committed the two robberies; rather, he claims that the Government failed to prove that *he* was involved.

Regarding his sufficiency challenge, Guerrero preserved our usual standard of review for such claims by moving for judgment of acquittal at the close of the evidence. FED. R. CRIM. P. 29(a); *United States v. Pankhurst*, 118 F.3d 345, 351 (5th Cir.), *cert. denied*, 118 S. Ct. 630 (1998). "Therefore, the standard of review is whether the evidence, as viewed in the light most favorable to the verdict, would permit a rational trier of fact to find [Guerrero] guilty beyond a reasonable doubt." *Pankhurst*, 118 F.3d at 352; *United States v. Greer*, 137 F.3d 247, 249 (5th Cir.), *cert. denied*, 118 S. Ct. 2305 (1998); *United States v. Jones*, 133 F.3d 358, 362 (5th Cir.), *cert. denied*, 118 S. Ct. 1854 (1998); *United States v. Grossman*, 117 F.3d 255, 258 (5th Cir. 1997). For such review, we draw "all reasonable inferences in support of the verdict". *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994).

Although the case against Guerrero, as the Government concedes, is based largely on circumstantial evidence, our sufficiency of the evidence review remains the same. *United States v. Delagarza-Villarreal*, 141 F.3d 133, 139 (5th Cir. 1997); *United States v. Rosalez-Ozozco*, 8 F.3d 198, 200 (5th Cir. 1993). We must accept credibility choices that support the jury's verdict, and we may not reweigh the evidence. *Delagarza-Villarreal*, 141 F.3d at 139. But, if "the evidence viewed in the light most favorable to the prosecution gives equal or near equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed". *Grossman*, 117 F.3d at 258 (quoting *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994)).

The Government maintains that, in part, it proved Guerrero's participation in the April and May robberies through *modus operandi* evidence and evidence of an overlay of participants. *Modus operandi* evidence may be introduced to prove identity; evidence of extraneous acts to prove identity is admissible pursuant to Rule 404(b),

> if the circumstances of the extraneous act were so similar to the offense in question that they evince a signature quality — marking the extraneous act as the handiwork of the accused. Indeed, proper identity evidence is tantamount to *modus operandi* evidence.

*United States v. Sanchez*, 988 F.2d 1384, 1393-94 (5th Cir. 1993) (internal quotation and citations omitted); *United States v.*

*Beechum*, 582 F.2d 898, 912 n.15 (5th Cir. 1978) (en banc) ("The identity of the defendant may be established by evidence of offenses extrinsic to the indictment....  The physical similarity must be such that it marks the offenses as the handiwork of the accused."); *see* FED. R. EVID. 404.

In *Sanchez*, 988 F.2d at 1394, our court found the similarity between the location of the two transactions, combined with the appearance of the same vehicle, to be "of signature quality". Likewise, our court has found a signature quality to two sexual assaults that occurred on the same military base at the same time of day. *United States v. Bailey*, 111 F.3d 1229, 1234 (5th Cir. 1997).

The Government notes that (1) all three robberies occurred in Brownsville within a relatively short period of time;  (2) each occurred during times of minimal bank traffic; (3) in each, a vehicle suddenly pulled up; (4) the robbers were wearing dress-casual clothes, but not masks; (5) the robbers in the first two robberies wore sunglasses, as did the driver in the last; (6) each occurred outside the bank while funds were being transferred; (7) the only witnesses were bank or armored car employees; (8) the employee in control of the money was the one assaulted; and (9) the getaway vehicle was found abandoned near each bank.

As in *Sanchez* and *Bailey*, such evidence has a *modus operandi* or signature quality, sufficiently establishing that the same group

was involved in all three robberies. And, there was sufficient evidence for a rational juror to conclude that Guerrero was a member of that group and participated in some of the robberies.

Additional evidence tying Guerrero to the robberies was provided by the testimony regarding his quite unusual behavior both when stopped by the TDPS officers and through his statements later that day regarding his wife's lack of knowledge. A rational juror could find that both incidents indicate circumstantially that Guerrero was involved in the group committing the robberies.

With regard to his behavior upon being stopped by the police, Guerrero testified that he thought exiting his vehicle with his hands raised was "normal"; and that he didn't "see anything wrong with that". And, concerning his statements about his wife, he testified that he made them because she did not have immigration documentation, and he feared she would have problems with United States immigration authorities. Of course, it is the province of the jury to weigh the credibility of witnesses. *E.g.*, ***United States v. Hawkins***, 658 F.2d 279, 289 (5th Cir. 1981).

More direct linkage to the April and May robberies is provided by Guerrero's fingerprints on the January getaway vehicle. Regarding it, Guerrero testified that he had met Torres; that Torres inquired about purchasing his automobile; that Torres had also suggested exchanging vehicles; that he drove Torres' vehicle for a few minutes; that a deal was never reached; that he never saw

Torres again; and that a photograph of the January robbery vehicle (again, Guerrero's prints were on a door handle) was "very similar" to the one Torres let him drive.[1]

---

[1] Although it acknowledged at oral argument on appeal that it was in error, the Government's brief stated that Guerrero's fingerprints were found on the door handle of the *armored truck* for the January robbery. Obviously, had this been the case, it would have been very powerful evidence indeed. (Instead, as noted, his fingerprints were found on a door handle of the January getaway vehicle.)

Amazingly, *no* reply brief was filed. Restated, this extremely important error in the Government's brief was *not* corrected by Guerrero through a reply brief. Instead, the error was pointed out at oral argument by questioning Guerrero's counsel, prior to the Government having the opportunity to correct the error. Immediately at the start of its presentation, the Government noted that, during preparation for oral argument, it had caught its briefing error; we are certain that, had we not already raised the point, the Government would have done so.

This incident underscores greatly the obvious extreme importance of two aspects of briefing: painstaking care in presenting the facts, *see* FED. R. APP. P. 28(a)(7), (e); and using a reply brief to contest erroneous factual statements in the appellee's brief, *see* FED. R. APP. P. 28(c). Both sides fell far short — the Government in the erroneous statement and Guerrero in *not* filing a reply brief.

Such errors cannot always be remedied at oral argument. We hear argument in only approximately 30% of our cases. For those relatively few cases for which we do hear argument, a great deal of time and effort is invested by our court in preparing for it. The panel does not then have the record, and therefore must be able to depend on the briefs. Needless to say, errors in briefs, as well as errors not corrected by a reply brief, greatly adversely affect our preparation and, more importantly, our understanding of the case, and result in time being spent on correcting such errors at argument, when that time should be available for other points at issue. Finally, even when argument is held, it may be that such an error may be missed, notwithstanding our close, post-argument review of the record in preparing the opinion. Counsel, who should and must know the case and record best, *must* prevent such errors.

Second, evidence linked Guerrero to Torres, whose fingerprints were on the paper license plates for the April and May getaway vehicles. Further, Guerrero testified that he saw Torres in a vehicle resembling that used in the January robbery, thus linking Torres to all three robberies.

Guerrero was also linked to Torres through Torres' address book, which listed Guerrero's name and telephone number, and through the presence of Guerrero's fingerprints in the May robbery getaway vehicle, on whose temporary tags Torres' prints were found. Also, as noted, Guerrero admitted at trial that he had met Torres. Furthermore, bank employee/robbery witness Thibodeaux picked a photograph of suspect Venegas out of a photo lineup as resembling the driver of the April getaway vehicle; as noted, his name was also in Torres' address book.

1.

Direct linkage to the May robbery was through Guerrero's fingerprints on a bottle and envelope in the May getaway vehicle. At trial, Guerrero did not offer any explanation for the presence of his fingerprints in that vehicle, nor was he asked to.

In November 1996, Villarreal, the armored car guard attacked in the May 1994 robbery, picked a photo of Guerrero out of a photo lineup. And, at the June 1997 trial, Villarreal testified that, while in a mall subsequent to the robbery, he had seen the May getaway vehicle passenger. Villarreal was unable at trial to

identify Guerrero as the robber; but, he did state that Guerrero resembled him. "It is a basic rule of evidence that witnesses need not assert that they are certain of their identification beyond a reasonable doubt." *United States v. Roberts*, 481 F.2d 892, 893 (5th Cir. 1973). Although "an uncertain in-court identification will not support a conviction where that identification is the *only* evidence offered on the issue of identity", such "tentative nature of ... identification is not fatal", if there is other sufficient evidence of identity. *Hawkins*, 658 F.2d at 289 (emphasis added).

The *modus operandi* evidence provides some of the evidence upon which the jury could find Guerrero guilty of the May robbery. There was sufficient evidence that he was a member of the group that committed all three. More directly, his prints were found on items in the May getaway vehicle. Furthermore, Villarreal was able to identify Guerrero out of 48 photos in an array, and he did testify that Guerrero resembled the robber.

In addition, the jury was allowed to consider the evidence regarding the January robbery; Guerrero's fingerprint was found on the getaway vehicle. Whereas Guerrero might conceivably explain away the presence of his fingerprints in one getaway vehicle (as he attempted to do for the January, but *not* the May, vehicle), the presence of his fingerprints in or on *two* such vehicles presents a "coincidence" that is difficult to attribute either to mere

- 15 -

happenstance or to Guerrero's unlucky but innocent connection with bank robbers.

Guerrero points out that his cousin testified that Guerrero was attending his daughter's birthday party on the day of the robbery, as evidenced by a photograph dated "5/25/94". However, this testimony was impeached on cross-examination in two respects. The witness (cousin) admitted that only two days earlier had she informed Guerrero's attorney of her ability to testify; and that, although she was Guerrero's cousin, she did not know that he had a brother named Miguel. Thus, the jury could reasonably have found the witness not credible and chosen to disregard the alibi testimony.

Finally, Guerrero relies on the *Borum* rule. In *Gibson v. Collins,* 947 F.2d 780, 785 (5th Cir. 1991), on accepting the rule of *Borum v. United States*, 380 F.2d 595 (D.C. Cir. 1967), our court stated:

> We accept the *Borum* majority's rule as we understand it: In a criminal case in which the *only evidence* is the discovery of the defendant's fingerprints at the scene of the crime, a reasonable juror may find guilt beyond a reasonable doubt *only* if the evidence indicates that the imprinted object was generally inaccessible to the defendant except during the commission of the crime.

(Emphasis added.)

In *Gibson*, 947 F.2d at 781, a home was burglarized and the defendant's fingerprints were found on two silver trays in the

- 16 -

home. Although the fingerprint expert was unable to determine the age of the prints, our court upheld the conviction, finding that it was reasonable for the jury to conclude that the defendant, who had never been allowed inside the victims' home, left the prints during the burglary. *Id*. at 781, 785-86.

Guerrero notes that the fingerprint expert could not determine the age of his fingerprints on the items in the May vehicle. And, he asserts that the Government produced no proof that those items were in any way connected to the robberies.

The **Borum** rule provides no relief for Guerrero. As emphasized above, the rule applies only when "the only evidence is the discovery of the defendant's fingerprints at the scene of the crime". **Gibson**, 947 F.2d at 785. As discussed, in addition to Guerrero's fingerprints in the getaway vehicle, there is other evidence connecting him to the robberies.

In sum, although Villarreal was unable in court to identify Guerrero as the robber, identity may be proved through inference and circumstantial evidence. *E.g.*, **United States v. Shah**, 44 F.3d 285, 295 (5th Cir. 1995). In addition to the *modus operandi* and overlay of participants evidence, Guerrero's prints in the May vehicle and Villarreal's testimony directly linked Guerrero to that robbery. There was sufficient evidence from which a reasonable jury could find Guerrero guilty for the May robbery and related counts.

A little more than three years after the April 1994 robbery of the TCB-Boca Chica, bank employee/robbery witness Gonzalez testified that, during the robbery, she had focused on the passenger; and that he had walked "pretty close" to her when he took the money from the security guard. A few days after the robbery, she identified a man from a photo lineup as the passenger, stating that she felt "very confident" in that selection because of "the shape of his face, his color and complexion and forehead as well as the broad shoulders". However, at a lineup a few days later, upon seeing that man, she was confident that she had been in error.

In 1996, almost three years after the robbery, Gonzalez picked Guerrero's photograph out of an array consisting of 36 pictures of Hispanic-appearing men, stating that he "look[ed] like" the April getaway vehicle passenger. At trial, she pointed out Guerrero as resembling the passenger, but admitted that she was not totally sure and that, as discussed above, shortly after the robbery, she had identified someone else.

For the April robbery, bank employee/robbery witness Thibodeaux testified that, while she could not make an identification of the getaway vehicle passenger, she believed that he was 5'5" tall. Although there was no proof at trial regarding

Guerrero's height, the jury, by observing him, could estimate it by comparison to Thibodeaux's testimony.

Again, identity may be proven though inference and circumstantial evidence. *E.g., Shah*, 44 F.3d at 295. However, as discussed *supra*, because of the tentative nature of Gonzalez's identification of Guerrero as the passenger in the April robbery, the other identity evidence introduced by the Government takes on added significance. *Hawkins*, 658 F.2d at 289.

Guerrero points out that, on cross examination, Gonzalez admitted that her identification was based on viewing the robber for only approximately two seconds; that she picked Guerrero's picture out of an array almost three years after the crime; and that she had previously identified someone else.

In addition, for the 7:30 a.m. robbery, and concerning Guerrero's at-work alibi, Guerrero's employer testified as a defense witness. But, he stated that he and his permanent employees worked from 8 a.m. to 7-8 p.m.; that Guerrero was not a permanent employee and was called in only when there was too much work; that Guerrero worked from 4 p.m until 9-11 p.m.(again, the robbery occurred at 7:30 a.m.); that Guerrero occasionally missed a couple of days of work; and that Guerrero was paid in cash and there were no records of when he worked.

Guerrero testified that he was at work when the robbery occurred at 7:30 a.m.; and that he started work at 7 a.m. Upon

further questioning by the Government, Guerrero stated that he sometimes worked in the early mornings, sometimes in the afternoons.

Although it is a very close call, we conclude that there was insufficient evidence to support Guerrero's conviction for the April robbery. The Government introduced evidence tending to prove that the same group committed these robberies; but, a Government witness testified that between three to five persons were believed to be members of this group. Furthermore, while only two persons participated in each robbery in April and May, four were involved in January. Although the signature or *modus operandi* evidence introduced by the Government is probative, it is *not* strong enough to prove that, not only was the same group involved in every robbery, but that Guerrero was involved in each.

The only evidence that specifically linked Guerrero to the April robbery was Gonzalez's testimony. Although it is, of course, the province of the jury to weigh a witness' credibility, the earlier-discussed rule in **Hawkins** is that an uncertain identification, like that given by Gonzalez, will not, alone, support a conviction. The *modus operandi* evidence applied to the April and May robberies. But, unlike the May robbery, in which it was combined with a tentative identification *and* Guerrero's fingerprints on items in the getaway vehicle, the *only* evidence

linking Guerrero to the April robbery was Gonzalez's tentative identification.

In sum, Gonzalez's eyewitness testimony alone cannot sustain Guerrero's conviction for the April robbery; the *modus operandi* evidence does not specifically link him to it. There was insufficient evidence for a rational juror to find Guerrero guilty beyond a reasonable doubt as to that robbery (related to counts 1-3).

## B.

Guerrero asserts in his brief "that the trial court erred in admitting evidence of *other bank robberies* and other suspects, particularly of Julio Torres[,] contrary to Fed. R. Evid. 404(b)". (Emphasis added.) However, in his discussion of this issue, Guerrero addresses *only* the admission of evidence regarding Torres; he does *not* present any arguments regarding the admission of evidence of other robberies. Of course, issues not briefed are deemed abandoned. *See* FED. R. APP. P. 28(a)(9); *e.g.*, **McCrary v. Poythress**, 638 F.2d 1308, 1310 n.2 (5th Cir. 1981).

Accordingly, concerning only Torres, Guerrero challenges the admission of the following testimony regarding: (1) Torres as a suspect in the robberies; (2) his address book; (3) his prints on the paper license tags for two of the getaway vehicles.

Under our usual standard of review, the admission of extrinsic evidence under Rule 404(b) is "subject to reversal only upon a

clear showing of an abuse of discretion". *Bailey*, 111 F.3d at 1233. But here, as hereinafter discussed, we instead review under the far more narrow standard for plain error.

At trial, Guerrero objected to *only* one of the now-challenged items of evidence: the testimony regarding Torres' address book. Moreover, that objection was based *only* on Federal Rules of Evidence 402 and 403, *not* on Rule 404(b).[2] Thus, concerning Rule 404(b), the *only* Rule now relied upon, the admission of the challenged evidence is reviewed *only* for plain error. FED. R. CRIM. P. 52(b); *e.g., United States v. Olano,* 507 U.S. 725, 732-35 (1993).

"Under Federal Rule of Criminal Procedure 52(b), this court may correct forfeited errors only when the appellant shows that (1) there is an error, (2) the error is plain, and (3) the error affects [his] substantial rights." *United States v. Ravitch*, 128 F.3d 865, 869 (5th Cir. 1997). And, even if such an error is

---

[2] Guerrero did *not* brief the Government's failure-to-object-claim as to Rule 404(b). In other words, he did *not* brief how he timely and properly objected on that basis. At oral argument, when questioned on this point, Guerrero's counsel stated he "thought" he had properly objected, and claimed there was a bench conference along this line. The record does indicate there was a bench conference before this evidence was admitted. But, the transcript, if any, of the conference is *not* in the record on appeal.

Of course, it is the duty of the party raising an issue on appeal to include the relevant items in the record on appeal. FED. R. APP. P. 11(a); *e.g., United States v. Coveney*, 995 F.2d 578, 587 (5th Cir. 1993). In short, the record on appeal does not contain the Rule 404(b) objection now claimed by Guerrero.

demonstrated, we will exercise our discretion to correct it only when it "seriously affects the fairness, integrity, or public reputation of judicial proceedings". *Id*.

For the first step in plain error review — whether the claimed error was "plain" ("clear" or "obvious", *e.g.*, **United States v. Calverly**, 37 F.3d 160, 163-64 (5th Cir. 1994)(en banc)) — the admissibility of evidence under Rule 404(b) is governed by a two-prong test: (1) "the evidence must be relevant to an issue other than the defendant's character"; and (2) "the probative value of the evidence must not be substantially outweighed by its undue prejudice and the evidence must meet the other requirements of Rule 403". **Bailey**, 111 F.3d at 1233.

The Government contends that the evidence regarding Torres' involvement in the robberies and Guerrero's connection to him was admissible because it completes the story of the crime. Pursuant to Rule 404(b), our court has approved such extrinsic evidence. *See* **United States v. Morgan**, 117 F.3d 849, 861 (5th Cir.), *cert. denied*, 118 S. Ct. 454, 641 (1997); **United States v. Kloock**, 652 F.2d 492, 495 (5th Cir. 1981) (evidence to complete story is admissible "unless its probative value was substantially outweighed by the danger of unfair prejudice"); **United States v. Wilson**, 578 F.2d 67, 72 (5th Cir. 1978) ("Courts and treatise writers have come to recognize an exception to the general rule of inadmissibility,

by allowing the introduction of evidence of other criminal activity in order to complete the story of the crime on trial").

And, our court has approved the admission of evidence regarding the defendant's relationship with another person where it was relevant in allowing the jury to determine whether the defendant committed the crime charged. In *United States v. Royal*, 972 F.2d 643, 648 (5th Cir. 1992), our court stated:

> In this case, the evidence pertaining to the Defendant's relationship with [a cooperating witness with whom the defendant allegedly conspired,] particularly as it involved prior drug transactions, was relevant to the crime charged in that it allowed the jury to understand the nature of the relationship between the two and evaluate whether it was likely that the Defendant would have conspired with [that witness] as charged.

Likewise, as discussed *supra*, evidence regarding Torres, including his relationship to Guerrero, was relevant for determining whether Guerrero was involved in the group that was committing the robberies. As noted, one Government witness stated that three to five persons were believed to be involved. Thus, Guerrero's connection to another person connected to the robberies was relevant and important evidence for the jury to consider in deciding whether Guerrero was so involved; and, pursuant to Rule 404(b), its probative value was *not* superseded by the protections afforded by Rule 403.

It is well to remember that, for this issue, we are reviewing *only* for plain error. For the first step in that analysis, we find

no "clear" or "obvious" error. Accordingly, our review stops there; there was no plain error. In other words, it is not "clear" or "obvious" that the evidence regarding Torres (Guerrero's name in Torres' address book; Torres a suspect in same robberies; Torres' fingerprints on getaway vehicles) was not relevant to issues other than Guerrero's character (namely, to Guerrero's involvement in the group that committed the robberies), or that such evidence did not satisfy the other requirements of Rule 404(b).

C.

Next, Guerrero asserts that he was entitled to judgment of acquittal for each robbery because the Government failed to prove that TCB-Boca Chica and Mercantile Bank were federally insured at the time they were robbed. Only the May robbery remains at issue.

The federal bank robbery statute under which Guerrero was convicted defines a "bank" as one whose deposits are insured by the FDIC. 18 U.S.C. § 2113(a), (f); **United States v. Slovacek**, 867 F.2d 842, 845 (5th Cir. 1989). "Proof that the institution meets this definition of 'bank' at the time of the robbery is an essential element of the offense that must be proven beyond a reasonable doubt to establish federal jurisdiction." **Slovacek**, 867 F.2d at 845. It would not seem necessary to caution the Government on the importance of solidly proving this. "Lack of sufficient proof [of this element] ... compels reversal and dismissal of the indictment, not just remand for a new trial with better evidence."

- 25 -

*Id*. at 846 (quoting **United States v. Maner**, 611 F.2d 107, 112 n.4 (5th Cir. 1980)).

At trial, a Mercantile Bank security officer testified on recall that it *is* federally insured. But, he did not testify that the bank *was* federally insured at the time of the robbery.

In **United States v. Rangel**, 728 F.2d 675, 676 (5th Cir. 1984), the only evidence that the bank was federally insured was a witness' affirmative answer to the question, "Is [the bank] federally insured". Our court ruled that the jury need not understand this testimony narrowly to mean that the bank was insured only at the time of trial, but that it could reasonably find from this evidence, taken in the context of the witness' complete testimony, that the bank was also insured when the crime occurred. **Id.** ("The only relevant date of insured status was the date of the ... robbery.... In context, and without any question being raised, the jury could take this evidence and find that the credit union was insured at the time of the [crime]."); *see also* **Slovacek**, 867 F.2d at 846.

Thus, based on **Rangel**, we hold that, in the light of the complete testimony by the bank official, the jury could find beyond a reasonable doubt that the bank was federally insured at the time of the robbery. (This notwithstanding, the Government is cautioned again as to proving this element more properly.)

The final issue is Guerrero's challenge to the bodily injury increase to his base offense level for each of the robbery convictions. Although the April robbery conviction is no longer at issue, the sentencing proceedings involving it remain relevant, because the two enhancements were often combined, including in the probation officer's response to Guerrero's objection to the increase recommendation in the Presentence Investigation Report.

For a robbery, "[i]f any victim sustained bodily injury", the sentencing court is to "increase the offense level according to the seriousness of the injury". U.S.S.G. § 2B3.1(b)(3). A two-level increase is required for "Bodily Injury"; greater increases are required for "Serious" and "Permanent or Life-Threatening" injuries. U.S.S.G. § 2B3.1(b)(3)(A)-(C).

Of these three degrees of injury, the increase at issue is for "bodily injury", defined as "any significant injury; *e.g.*, an injury that is painful and obvious, *or* is of a type for which medical attention ordinarily would be sought". *See* U.S.S.G. § 1B1.1, comment (n.1(b)) (emphasis added).

Very little was said in the PSR about the degree of injury cited to justify the enhancement recommendation. The PSR stated, for the April robbery, only that a guard was "pistol whipped"; for the May robbery, only that one "was struck on his back".

Regarding these enhancements, the PSR addendum states that Guerrero objected *only* to the recommendation for the assault in the April robbery. In other words, it does *not* appear that he objected to the recommended increase for the May robbery. (Guerrero's objections to the PSR are not in the record on appeal. Federal Rules of Criminal Procedure 32(b)(6)(B) and (C) require the defendant to submit to the probation officer such objections; that officer must then include an addendum addressing any unresolved objections. Thus, although Guerrero was not required to file his written objections with the court, it is, again, the duty of the party raising an issue on appeal to include the relevant items in the record on appeal. FED. R. APP. P. 11(a); *e.g., Coveney*, 995 F.2d at 587.)

Moreover, Guerrero's referenced objection, apparently limited to the April assault, addressed *only* no medical testimony or records being introduced to support finding bodily injury. In response, the probation officer stated in the PSR addendum that the Sentencing Guidelines, as discussed *supra*, do not require medical treatment. But, in responding to this objection (again, apparently limited to the recommended increase for *the April robbery*), the officer also stated that the assaulted guard for the May robbery "sustained bodily injury"; and that "both guards were assaulted". In so doing, the officer advised that "bodily injury remains a

disputed issue and will require resolution by the [district court] at the sentencing hearing".

As noted, different judges tried and sentenced Guerrero. In other words, the sentencing judge did not hear the testimony at trial, including that relevant to bodily injury. Nor is there any indication that he read the trial transcript.

At sentencing, in addressing Guerrero's limited objection, the judge stated: "Objection Number Two [the objection to the April robbery increase, referenced in the PSR addendum] makes reference to the fact that [Guerrero] was assessed points because of the *allegation* involving bodily injury". (Emphasis added.) In other words, the sentencing judge referred to only one bodily injury "allegation" which indicates that he also believed the objection (as presented in the PSR addendum) was only to the April increase.

Guerrero's counsel responded, "That is correct". Moreover, at no point during the rest of the brief discussion of this objection at the sentencing hearing did Guerrero attempt to clarify that he objected not just to the April increase, but also to that for May.

The sentencing judge gave the Government and Guerrero the opportunity to introduce further evidence; neither did. The court then stated that only "minimal, minimal injury" is required for a bodily injury increase, and imposed it for both robberies.

Inconsistent with his apparent limited objection in the district court (no medical evidence and only as to the April

robbery), Guerrero now challenges the lack of direct evidence to support an increase, including for the May robbery. The Government does *not* contend either that Guerrero failed to object to the increase for that robbery, or that his objection in district court, which apparently touched only on a lack of medical proof, differed from the broader lack of evidence claim asserted now. Instead, it maintains solely that the severity of the attack alone is sufficient to support the increase.

No authority need be cited for the fact that we, *not the parties*, determine our standard of review. For the May robbery increase, Guerrero is arguably raising issues for the first time on appeal; if so, they would be reviewed only for plain error. But, in the light of the above-discussed uncertainty as to the scope of his objection to the PSR (demonstrated, in part, by the PSR addendum stating that the assaulted guard in each robbery "sustained bodily injury"), we conclude, *dubitante*, that review under our normal, rather than plain error, standard is in order. Accordingly, the district court's interpretation of the Guidelines is reviewed *de novo*; its findings of fact, for clear error. *E.g.,* **United States v. Claiborne**, 132 F.3d 253, 254 (5th Cir.), *cert. denied*, 118 S. Ct. 1855 (1998).

Both Guerrero and the Government fail to cite any cases regarding the interpretation of the Guidelines' "bodily injury" increase. In any event, regarding sufficient proof of injury, and

although not for the Guidelines' type at issue, our court has found, for example, that post-traumatic stress disorder constitutes a "serious" injury. *United States v. Reed*, 26 F.3d 523, 530 (5th Cir. 1994). The "bodily injury" question at hand has not been addressed by this circuit. We look to our sister circuits for guidance.

The examined cases hold, for obvious reasons, that the focus of the inquiry is *not* on the actions of the defendant, but rather *on the injury sustained*. *United States v. Perkins*, 89 F.3d 303, 308 (6th Cir. 1996) ("[t]he basis for this enhancement is not the striking of the victim in the head ... rather, it is the fact that doing so caused physical injury"); *United States v. Dodson*, 109 F.3d 486, 489 (8th Cir. 1997) ("It is not the defendant's conduct, however, which determines whether a victim has sustained bodily injury; rather, the resultant physical injury is the determining factor"); *United States v. Perkins*, 132 F.3d 1324, 1326 (10th Cir. 1997) ("We agree with [the defendant] that it is the actual nature of the *injury* sustained and not generalized statements concerning the nature of the conduct or the victim's age that must be the focus of the district court's determination"). *See also United States v. Harris*, 44 F.3d 1206, 1218 (3rd Cir. 1995) (reversing "bodily injury" increase where witness testified that victims were sprayed with mace and later treated by medical personnel, but district court made no findings with regard to whether victims

suffered either pain or injury or why victims received medical treatment).

The following has been found to constitute "bodily injury": hitting the victim in the head with a gun and kicking him in the face, causing injury, *Perkins*, 89 F.3d at 308; spraying victims with mace, causing several injuries and requiring the victims to obtain medical treatment and miss several days of work, *United States v. Taylor*, 135 F.3d 478, 482 (7th Cir. 1998); spraying bank tellers with mace, causing pain for hours and residual effects for days, *United States v. Robinson*, 20 F.3d 270, 278-79 (7th Cir. 1994); knocking the victim down, causing bumps, bruises, and a back injury that required chiropractic treatment, *United States v. Hamm*, 13 F.3d 1126, 1127-28 (7th Cir. 1994); a slap in the face, causing swelling and pain that required medical attention, *United States v. Greene*, 964 F.2d 911, 911-12 (9th Cir. 1992); and a small laceration and bruising, requiring medical attention, *Perkins*, 132 F.3d at 1325. *But see United States v. Lancaster*, 6 F.3d 208, 210 (4th Cir. 1993) (affirming finding that being sprayed with mace is not "significant" injury warranting bodily injury increase because burning sensation suffered by victim was "only momentary and the mace produced no lasting harm").

In most of these cases upholding "bodily injury", the courts indicated that the victim sought medical treatment for the injury. But, again, the Guidelines do *not* condition the increase on such

treatment.  The injury must be *either* "painful and obvious" *or* "of a type for which medical attention *would ordinarily be sought*".  U.S.S.G. § 1B1.1, comment (n.1(b)) (emphasis added).  Another common thread in the above-discussed cases is that there appears to have been evidence regarding the injury sustained.

For the May robbery, the PSR does not indicate that the guard's being "struck on his back" resulted in any bruising, swelling, or other type injury.  And, the assaulted guard did not testify at sentencing.

In **Dodson**, 109 F.3d at 488, the PSR recommended the bodily injury increase, stating that a police officer sustained "minor injuries" from a struggle with the defendant, during which the officer was choked.  The Eighth Circuit reversed the imposition of the enhancement because "the government did not call [the officer] to testify regarding the nature of his injuries or whether he had suffered any pain as a result of being choked".  **Id.** at 489.  Further, the court disagreed with the finding that the act of choking, itself, falls within the category of "bodily injury", because such a finding improperly focuses on the act *rather* than on the injury.  **Id.**

The imposition of the May robbery increase constitutes reversible error.  Such error results from the district court's erroneous guideline interpretation and finding of fact.

The first reason for the reversible error is the sentencing judge's comment that only a "minimal, minimal injury" is required to support the increase.  As noted in the earlier-quoted definition of "bodily injury", the Guidelines define "bodily injury" in part as "any *significant* injury", prior to giving the two categories: "painful and obvious", *or* "type for which medical attention ordinarily would be sought".  U.S.S.G. § 1B1.1 (comment n.1(b)) (emphasis added).  The sentencing judge's level of injury comment, taken at its face value, is contrary to this definition.

Second, there is *no evidence of any injury*.  Consistent with the above-discussed decisions from other circuits, we reject the Government's assertion that evidence regarding the severity of the attack is *always* sufficient to support a "bodily injury" increase. *See **Perkins***, 89 F.3d at 308; ***Dodson***, 109 F.3d at 489; ***Perkins***, 132 F.3d at 1326.  Of course, an exception lies for certain types of attacks for which the resulting injury follows automatically and is obvious.  That is *not* the case here.

The error affects the length of Guerrero's sentence for the May robbery count.  Therefore, we vacate that sentence and remand for resentencing on that count.

## III.

For the reasons stated above, those portions of the judgment as to Guerrero's convictions for the May 1994 robbery count and the convictions and sentence for the related firearms counts are

**AFFIRMED**; those portions of the judgment as to the convictions and sentences for the April 1994 robbery and the related firearms counts and as to the sentence for the May 1994 robbery count are **VACATED**; and we **REMAND** for resentencing on the May robbery count.

*AFFIRMED in PART; VACATED in PART; and REMANDED*