**Thomas A. McCRARY et al., Plaintiffs-Appellants,**

v.

**David B. POYTHRESS, Secretary of the State of Georgia and Chairman State Election Board, et al., Defendants-Appellees.**

**No. 78–3110.**

United States Court of Appeals, Fifth Circuit.

March 12, 1981.

Rehearing and Rehearing En Banc Denied April 13, 1981.

---

Jesse Cleveland, Atlanta, Ga., for plaintiffs-appellants.

Arthur K. Bolton, Atty. Gen., Michael J. Bowers, Sr., Asst. Atty. Gen., State Law Dept., Robert S. Stubbs, II and Don A. Langham, Asst. Attys. Gen., Atlanta, Ga., for defendants-appellees.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

This appeal asserts that the district court erred in dismissing the complaint of the plaintiffs below, who challenged many provisions of the Georgia Election Code, Ga. Code Ann. § 34–101 *et seq.* The Independent Party of Georgia, a political body under the Georgia Election Code, and Thomas McCrary, Jesse Cleveland, and James Yarbrough, nominees of the Party for various Georgia elective offices, were the plaintiffs below. The defendants were the Georgia Secretary of State (who, by virtue of his office, is also Chairman of the State Elections Board), the Director of the Elections Division, and the Executive Director of the Georgia Campaign and Financial Disclosure Commission, all in their representative capacities. In their brief plaintiffs list twenty-one issues, some of which are duplicitous, some of which were not presented to the trial court below, and some of which are not specifically argued in the appellate brief. We shall attempt to ferret out the issues raised by appellant, consolidate them, and treat them in a manner which will answer each of appellant's numbered issues and at the same time try to give some coherence to the opinion.

Appellants' first four numbered issues complain about the defendants' application of the Georgia Campaign and Financial Disclosure Act (Ga.Code Ann. § 40–3801 et seq.) to plaintiffs. Appellants complain that the Georgia Secretary of State and the Director of the Georgia Campaign and Financial Disclosure Commission wrongfully required certain campaign financial disclosure reports of plaintiff McCrary. Additionally, those defendants were charged with issuing a press release announcing that McCrary had failed to file the necessary disclosure reports. Subsequently, the defendants learned that such a disclosure was not required by Georgia law and they wrote McCrary that they had made a mistake and that such a report would not be required of him. The trial court dismissed this claim on the ground of mootness in that the defendants had conceded an error and abandoned the request for the reports.[1] The court did not specifically address McCrary's claim of libel as a result of the incorrect report to the newspaper nor his claim that his constitutional and civil rights were violated by defendants' false assertion that he had not complied with the disclosure statute.[2]

Appellants level a broadside attack on Georgia's Election Code that, in short, alleges unconstitutional restrictions upon plaintiffs' access to the general election ballot.[3] For example, their issue # 18 charges that Ga.Code Ann. § 34–1012 requires appellants to set up an elaborate de facto primary machinery in contravention of the Supreme Court's holding in *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Appellants' attack flies in the face of approval of Georgia's statutory election machinery by the Supreme Court in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Since the opinion of the Supreme Court in that case answers many of the issues raised by appellant, we will extensively quote from it. We add that appellants point us to no decision of our highest court which limits that broad approval of Georgia's election procedures.

The basic structure of the pertinent provisions of the Georgia Election Code is relatively uncomplicated. Any political organization whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election is a "political party." Any other political organization is a "political body." "Political parties" conduct primary elections, regulated in detail by state law, and only the name of the candidate for each office who wins this primary election is printed on the ballot at the subsequent general election, as his party's nominee for the office in question. A

---

1. That the issue is now moot is illustrated by the treatment of a similar dispute in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979): Appellant "has presented no evidence creating a reasonable expectation that the [Commission] will repeat its purportedly unauthorized actions in subsequent elections. Appellant's conclusory assertions that the actions are capable of repetition are not sufficient . . . ."

2. Appellants argue in their brief, at 10–13, that a live issue persists, but, as we have noted, *supra* note 1, their claims amount to no more than "conclusory assertions" that such misunderstandings are capable of repetition. This we deem insufficient for the granting of any prospective relief. Appellants have not argued in their brief, however, that the lower court erred in failing to find any deprivation of state or federal constitutional rights as a result of the prior experience. We therefore deem any claim of error to that effect to have been

waived. F.R.A.P. 28(a)(4). *See, e. g., Harris v. Plastics Manufacturing Co.*, 617 F.2d 438, 440 (5th Cir. 1980); *Tedder v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir. 1979).

3. In summary, these claims allege that differing provisions governing the filing of notices of candidacy by party primary candidates and those qualifying by petition deny the latter equal protection (§ 34–1002(c)); that the number of nominating signatures required of petition-qualifying candidates is too high (§ 34–1010(b)); that the petition filing deadline is too early (§ 34–1002(d)); that provisions designed to protect political bodies from unauthorized candidacies are arbitrary (§ 34–1010(g)); that state election officials' authority to inspect nominating petitions is unconstitutionally vague (§ 34–1011(a)); that Georgia burdens political bodies with an unduly elaborate nominating procedure (§ 34–1012); and that write-in procedures in elections using voting machines are inadequate (§ 34–1206(g)).

nominee of a "political body" or an independent candidate, on the other hand, may have his name printed on the ballot at the general election by filing a nominating petition. This petition must be signed by a "number of electors of not less than five per cent of the total number of electors eligible to vote in the last election for the filing of the office the candidate is seeking. * * *'" The total time allowed for circulating a nominating petition is 180 days, and it must be filed on the second Wednesday in June, the same deadline that a candidate filing in a party primary must meet.

It is to be noted that these procedures relate only to the right to have the name of a candidate or the nominee of a "political body" printed on the ballot. There is no limitation whatever, procedural or substantive, on the right of a voter to write in on the ballot the name of the candidate of his choice and to have that write-in vote counted.

In this litigation the appellants have mounted their attack upon Georgia's nominating-petition requirement on two different but related constitutional fronts. First, they say that to require a nonparty candidate to secure the signatures of a certain number of voters before his name may be printed on the ballot is to abridge the freedoms of speech and association guaranteed to that candidate and his supporters by the First and Fourteenth Amendments. Secondly, they say that when Georgia requires a nonparty candidate to secure the signatures of 5% of the voters before printing his name on the ballot, yet prints the names of those candidates who have won nomination in party primaries it violates the Fourteenth Amendment by denying the nonparty candidate the equal protection of the laws. Since both arguments are primarily based upon this Court's decision in *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, it becomes necessary to examine that case in some detail.

.  ·    ·      ·      ·      ·

[T]he *Williams* case, it is clear, presented a statutory scheme vastly different from the one before us here. Unlike Ohio, Georgia freely provides for write-in votes. Unlike Ohio, Georgia does not require every candidate to be the nominee of a political party, but fully recognizes independent candidacies. Unlike Ohio, Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties. Unlike Ohio, Georgia does not impose upon a small party or a new party the Procrustean requirement of establishing elaborate primary election machinery. Finally, and in sum, Georgia's election laws, unlike Ohio's do not operate to freeze the political status quo. In this setting we cannot say that Georgia's 5% petition requirement violates the Constitution.

Anyone who wishes, and who is otherwise eligible may be an independent candidate for any office in Georgia. Any political organization, however new or however small, is free to endorse any otherwise eligible person as its candidate for whatever elective public office it chooses. So far as the Georgia election laws are concerned independent candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon, the free circulation of nominating petitions. A voter may sign a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on

the other hand is a person who was not even registered at the time of the previous election. No signature on a nominating petition need be notarized.

The open quality of the Georgia system is far from merely theoretical. For the stipulation of facts in this record informs us that a candidate for Governor in 1966 and a candidate for President in 1968, gained ballot designation by nominating petitions, and each went on to win a plurality of the votes cast at the general election.

In a word, Georgia in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life. Thus, any political body that wins as much as 20% support at an election becomes a "political party" with its attendant ballot position rights and primary election obligations, and any "political party" whose support at the polls falls below that figure reverts to the status of a "political body" with its attendant nominating petition responsibilities and freedom from primary election duties. We can find in this system nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments.

The appellants' claim under the Equal Protection Clause of the Fourteenth Amendment fares no better. This claim is necessarily bottomed upon the premise that it is inherently more burdensome for a candidate to gather the signatures of 5% of the total eligible electorate than it is to win the votes of a majority in a party primary. That is a premise that cannot be uncritically accepted. Although the number of candidates in a party primary election for any particular office will, of course, vary from election to election, the appellee's brief advises us that in the most recent election year there were 12 candidates for the nomination for the office of Governor in the two party primaries. Only two of these 12, of course, won their party primaries and had their names printed on the ballot at the general election. Surely an argument could as well be made on behalf of the 10 who lost, that it is *they* who were denied equal protection *vis-a-vis* a candidate who could have had his name printed on the ballot simply by filing a nominating petition signed by 5% of the total electorate.

The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

Insofar as we deal here with the claims of a "political body," as contrasted with those of an individual aspirant for public office or an individual voter, the situation is somewhat different. For it is true that a "political party" in Georgia is assured of having the name of its nominee—the primary election winner—printed on the ballot, whereas the name of the nominee of a "political body" will be printed only if nominating petitions have been filed that contain the requisite number of signatures. But we can hardly suppose that a small or a new political organization could seriously urge that its interests would be advanced if it were forced by the State to establish all of the elaborate statewide, county-by-county, organizational paraphernalia required of a "political party" as a condition for conducting a primary election. Indeed, a large reason for the Court's invalidation of the Ohio election laws in *Williams v. Rhodes, supra,* was precisely that Ohio *did* impose just such requirements on small and new political organizations.

403 U.S. at 433–34, 438–41, 91 S.Ct. at 1971–72, 1974–76 (footnotes omitted, emphasis in original).

It is clear from reading *Jenness* that the Supreme Court looked at the totality of the

Georgia statutory election machinery in approving certain criticized sections of the statute, as it did in *Williams v. Rhodes*, in which the court disapproved of the Ohio election system because of its collective deficiencies. We emphasize appellants' charge that Georgia's five percent signature requirement is unconstitutional and the statement in their brief that the Supreme Court in *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), held "that one percent of the voters' signatures in the last election or 22,000 signatures was the maximum requirement." This is a gross distortion of the holding in that opinion. In referring to the one-percent requirement the Court clearly indicated that more than that provision was involved: "The District Court balanced this lenient one percent petition requirement against what it thought was a somewhat burdensome requirement of precinct, county, and state conventions ...." 415 U.S. at 782, 94 S.Ct. at 1307, n.15. Justice Douglas dissented in *White* and favorably compared the Georgia election laws as approved in *Jenness* to the Texas election scheme of which he disapproved. In concluding that the totality of requirements imposed upon minority parties was unconstitutional, he went on as follows:

> An analysis of the requirements imposed on independent candidates leads me to the same conclusion. Under the procedures reviewed in *Jenness*, independent candidates seeking a ballot position had six months to secure the signatures of 5% of the eligible electorate for the office in question. The percentage required in Texas ranges, according to the office, from 1% of the last statewide gubernatorial vote to 5% of the last local gubernatorial vote, and in any case no more than 500 signatures are required; the candidate, however, has only 30 days in which to gather them. In *Jenness* a voter could sign a candidate's petition even though he had already signed or would sign others.

Here no voter may sign the application of more than one candidate. In *Jenness* a voter who signed the petition of an independent was free thereafter to participate in a party primary and a voter who previously voted in a party primary was fully eligible to sign a petition. Here independents are not even allowed to seek signatures until after the major party primaries and no voter who has participated in a party primary is allowed to sign an independent candidate's application. In *Jenness* no signature on a nominating petition had to be notarized, but that is not the case here.

In *Jenness* we were able to say that Georgia "has insulated not a single potential voter from the appeal of new political voices within its borders." 403 U.S., at 442, 91 S.Ct., at 1976. In Texas, however, the independent, like the minority party, must "draw [his] support from the ranks of those who [are] either unwilling or unable to vote in the primaries of the established parties." *American Party of Texas v. Bullock*, 409 U.S. [803], at 806, 93 S.Ct. [25], at 27 [34 L.Ed.2d 63]. As with minority parties, I do not believe that Texas may constitutionally leave independent candidates to "be content with the left-overs to get on the ballot." *Ibid.*

415 U.S. at 797–99, 94 S.Ct. at 1314–15. Appellants are simply wrong in stating in their brief that the Court in *White* established 1% as the maximum percentage of voter signatures that the state may require for qualification purposes.[4]

Appellants also complain that the petition filing deadline is too early. This was expressly answered by *Jenness*: "Unlike Ohio, Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties." 403 U.S. at 438, 91 S.Ct. at 1974. Since that opinion the deadline has been moved from the second Wednesday in June to the second Wednes-

---

4. Since the filing of the complaint the 5% requirement in Georgia has been lowered to 2½% to qualify for statewide office, but remains at 5% for offices not voted upon statewide. Ga.Code Ann. § 34–1010(b), amended 1979.

day in July. *See* Ga.Code Ann. § 34–1002, amended 1979.[5]

Finally, appellants complain that Ga.Code Ann. § 34–1103(c) is unconstitutional because the political party receiving the highest number of votes in the last gubernatorial election shall be listed in the first column on the left side of the ballot. The district court order dismissing the complaint is dated September 14, 1978, and judgment was entered against plaintiffs the same day. This order neither mentions nor rules on any issue pertaining to Ga.Code Ann. § 34–1103(c) or ballot placement. Our review of the original complaint, filed July 10, 1978, reveals that it does not make reference to Ga.Code Ann. § 34–1103(c). On September 6, 1978, plaintiff filed an "Amendment of Complaint" in which this Code section and ballot placement issue is pled. The defendants filed a renewed motion to dismiss and supporting brief on September 15, and plaintiffs filed their reply brief on September 19, 1978. Plaintiffs filed their Notice of Appeal from the order of September 14 on September 22, 1978.

■ Appellants now claim that the lower court erred in not deciding this issue in their favor.[6] We think the error instead is on the part of appellants. Through oversight or error, the lower court completely failed to consider the issue in appellants' amendment to their complaint. It is true that Rule 15(a), F.R.Civ.P., allows an amendment once as of right "any time before a responsive pleading is served," and that the defendants' 12(b)(6) motion to dismiss is not a "responsive pleading," Rule 7(a). But it is also true that the lower court granted an extension of time for the plaintiffs to respond to the motion to dismiss, and yet the amendment to the complaint was filed well after this time. We need not reach any question of the interaction of Rule 15 with the rules governing dismissal, for we conclude that, under the circumstances, the lower court was entitled to rely on its expectation that issue had been joined on the sufficiency of the complaint. If the lower court was of the opinion, right or wrong, that the amendment came too late, appellants still had several avenues of relief available in that forum. They could have filed a Rule 59(e) motion to alter or amend the judgment. Or they could have moved the court to reopen the judgment under Rule 60(b)(1) as a judgment entered through the mistake or inadvertence of the trial court. This court has held that Rule 60(b)(1) relief is available when the mistake or inadvertence is that of the trial judge. *See e. g., Oliver v. Home Indemnity Co.*, 470 F.2d 329 (5th Cir. 1972),

**5.** We are not confronted with the burdens faced by independent or third party Presidential candidates who encounter widely varying restrictions on access to state ballots in the course of the extended Presidential campaign season. Several factors peculiar to our only nationwide election would then have to be considered in balancing the state's interest in reasonable ballot control against the candidate's right of access, most important among these the unusual length of the Presidential campaign, coupled with the lack of any nationwide primary process in which party candidates can be evaluated on other than a state-by-state basis. In such a setting a particular state's insistence on an early petition filing deadline, by which time an independent or minority party national candidate must qualify his or her electors, takes on a different character. *Cf. Anderson v. Hooper*, 498 F.Supp. 898 (D.N.M. 1980) (order granting preliminary injunction); *Anderson v. Celebrezze*, 499 F.Supp. 121 (S.D. Ohio 1980) (order granting permanent injunction), *U.S. cert. denied,* —— U.S. ——, 101 S.Ct. 41, 65 L.Ed.2d 1181 (1980); *Anderson v. Mor-*

*ris*, 500 F.Supp. 1095 (D.Md.1980) (same); and *Anderson v. Quinn*, 495 F.Supp. 730 (D.Me. 1980) (same), all enjoining enforcement of early March or April state filing deadlines in the case of a Republican Presidential candidate who announced his independent candidacy on April 24.

**6.** We will not reach the merits of this claim, without any consideration by the lower court. This court habitually declines to reach questions not passed on below unless (1) the question is purely one of law and (2) failure to reach it would result in a miscarriage of justice. *See e. g., Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 658, n.47 (5th Cir. 1974), *reh. denied,* 503 F.2d 567; *Evans v. Triple R Welding & Oil Field Maintenance Corp.*, 472 F.2d 713, 716 (5th Cir. 1973); and *McCrea v. Harris County Houston Ship Channel Nav. Dist.*, 423 F.2d 605, 610 (5th Cir. 1970), *cert. denied,* 400 U.S. 927, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970). Neither factor is present here.

and *Meadows v. Cohen*, 409 F.2d 750 (5th Cir. 1969). And we have long since held that Rule 60(b)(1) relief might be sought even after the entry of notice of appeal. *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697 (5th Cir. 1955). The latter would have been the more appropriate course for appellants to have taken. Failing that, we direct that the lower court modify its judgment of dismissal so as to provide that the claim contained in the amended complaint be dismissed without prejudice.

Issues 6 through 10, concerning the lower court's failure to make various rulings in their favor, were neither addressed to the lower court nor argued by appellant. We have carefully considered all issues discussed by appellants in their briefs and find no error on the part of the district court.

Judgment MODIFIED and AFFIRMED as modified.