**Ray CAMPBELL, Plaintiff,**

v.

**James BENNETT, et al., Defendants.**

**No. Civ.A. 02–T–784–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 8, 2002.

Timothy L. Shelton, Christopher E. Malcom, Malcom Terry & Shelton PC, Moulton, AL, for Plaintiff.

John J. Parks, Jr., Office of the Attorney General, Charles E. Grainger, Jr., Asst. Atty. General, Alabama Secretary of State's Office, Montgomery, AL, for Defendants.

## PRELIMINARY INJUNCTION

MYRON H. THOMPSON, District Judge.

In this lawsuit, plaintiff Ray Campbell challenges a change in the deadline for

independent candidate registration effected by a new Alabama statute and the corresponding rejection of his candidacy by the State Election Board based on his failure to satisfy the new deadline. The defendants are the Alabama Secretary of State and Attorney General and two county probate judges. Campbell's challenge is based on the first and fourteenth amendments to the United States Constitution as enforced through 42 U.S.C.A. § 1983. The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. § 1331.

Currently before the court is Campbell's request that the court enter a preliminary injunction that requires the defendants either to place his name on the ballot or to delay the final certification of candidates for the general election until the merits of this case have been resolved. For the reasons below, the court will grant Campbell's request and order that his name be placed on the ballot.

## I. BACKGROUND

The relevant facts in chronological order are as follows:

*December 28, 2001:* The Governor of Alabama signed Act No. 2001–1131, which

---

1. For the text of § 17–7–1 of the 1975 Alabama Code prior to the passage of Act No. 2001–1131, see appendix A. For the text of § 17–7–1 after passage of the Act, see appendix B.

2. The preamble to Act No. 2001–1131 explained the purpose of the Act as follows:
 "Under existing law, an unsuccessful candidate in a primary election is prohibited from running in the general election as an independent candidate but is not prohibited from running in the general election as the nominee of another political party.
 "This bill would prohibit candidates who are unsuccessful in a primary election from appearing on the general election ballot as the nominee of another political party.

amended the State's "sore loser" statute by, among other things, moving the deadline for independent candidate registration (that is, the candidate's filing of a petition signed by the statutorily required number of voters) from six days after the second primary election (which would be July 1 for the 2002 election cycle) to the date of the first primary election (which would be June 4 for the 2002 election cycle). 1975 Alabama Code § 17–7–1.[1] While the change in deadlines was designed to prevent those party candidates who lost in the primary from reentering the general election under another party label, the new act changed the registration date for independents as well.[2] According to its text, the Act would become effective "immediately upon its passage and approval by the Governor, or its otherwise becoming law." Because changes to Alabama's voting processes must be precleared by the Justice Department, the law did not immediately go into effect.

*January 2002:* The State published a State Election Handbook, which continued to list the deadline for independent candidate registration as July 1, 2002. The handbook described the legislation passed in December, but described Act No. 2001–

"This bill would require each candidate who has been put in nomination by any caucus, convention, mass meeting, or other assembly of any political party or faction to file the necessary documents for placement on the ballot with the appropriate election official on the date of the first primary election provided by law for political parties. This bill would require each person who has requested to be an independent candidate to file the necessary documents for placement on the ballot with the appropriate election official on the date of the first primary election provided by law for political parties."

1131 as being subject to Justice Department approval. No timetable for preclearance of the Act was given, and the Secretary of State's Office admitted that it could not give prospective candidates any idea whether the Act would be precleared in time for the 2002 election cycle, and, accordingly, whether the new deadline would be effective.

*March 29, 2002:* Act No. 2001–1131 was submitted for preclearance. The Department of Justice had 60 days from this date to respond to the preclearance request by either preclearing the statute or by registering objections. If no answer was received within 60 days, then the statute would be automatically precleared.

*April 23, 2002:* Campbell decided to run for the District 7 seat in the Alabama House of Representatives. On this day, he visited the Secretary of State's Office, where he obtained a petition form to be used in collecting the requisite number of signatures in order for his name to appear on the ballot, as well as print material detailing the relevant deadlines for his prospective candidacy. This material identified July 1, 2002, as the final date on which independent candidate registrations would be accepted. The Director of Elections for the Secretary of State's Office had no policy to tell prospective candidates of the possibility that the deadline would be moved forward because of the new statute, and no one told Campbell during his visit of the possibility of the new statute taking effect and a different deadline being imposed. During the next month, Campbell recruited approximately six family members and friends to collect signatures on his behalf.

*May 24, 2002* (approximately): Campbell accessed the Secretary of State website on the Internet, and July 1, 2002, was still listed as the deadline for independent candidate registration. Again, nothing on the website alerted Campbell to the possibility that this deadline would be moved up because of a new statute.

*May 25, 2002:* Campbell hosted a barbecue as part of his signature drive, advertising the event through the media in the weeks leading up to the event. After the barbecue, Campbell had collected 150–175 signatures out of approximately 380 needed to get his name placed on the ballot. He told his volunteers to continue collecting signatures and to return the petitions by June 15, at the latest, to ensure that he could meet the July 1 deadline for registration.

*May 27, 2002:* As of this day, the Director of Elections still did not know if the Act would be precleared in time for the new June 4 deadline to become effective for the 2002 election cycle.

*May 28, 2002:* The Department of Justice precleared Act No. 2001–1131, and informed the State Attorney General's Office by letter.

*May 29, 2002:* The Alabama Secretary of State's Office received notice of preclearance from the Attorney General's Office. The Secretary of State then issued a press release to the general public and began a mass mailing to all the probate judges informing them of preclearance and of the new deadline's applicability to the 2002 election cycle, so that the probate judges could in turn inform local candidates. But, because the mailing did not actually get in the mail until Thursday or Friday, May 30 and 31, and because the following Monday, June 3, was a state holiday, the probate judges did not receive the notices until Tuesday, June 4, the same day as the deadline.

*June 2, 2002:* Campbell learned that Act No. 2001–1131 had been precleared by watching the 10:00 p.m. Sunday local news. The report made mention of the new deadline for independent candidate registration, which was now only two days away. Campbell was unable to find sufficient volunteers or to organize sufficient promotional events before June 4 to obtain the remaining signatures needed for registration.

*June 3, 2002:* Campbell tried to contact the Secretary of State's Office to confirm that the deadline had been changed, but the office was closed for the Monday state holiday. Eventually, Campbell spoke with a reporter friend, who, after speaking with several probate judges and other officials, told him that the new deadline did not affect independent candidates and that he still had until July 1 to register.

*June 4, 2002:* Act No. 2001–1131's new deadline for independent candidate registration arrived. One independent candidate, Tracy Larkin, met the new deadline, submitting 2500 signatures to qualify to be put on the ballot for the Alabama Senate District 26 seat. Campbell did not have enough signatures to qualify on this date.

*June 21, 2002:* Campbell submitted his registration to the Elections Office of the Secretary of State, attaching the signatures of approximately 450 qualified voters, well in excess of the number needed to be placed on the ballot. His registration, however, was denied as untimely filed after the new June 4 deadline.

*July 1, 2002:* The old deadline for independent candidate registration arrived and passed.

## II. DISCUSSION

Whether to issue a preliminary injunction lies within the sound discretion of the district court. *Frio Ice, S.A. v. Sunfruit, Inc.,* 918 F.2d 154, 159 (11th Cir.1990). District courts should apply a four-prong test when determining whether a preliminary injunction should issue. The movant must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002).

### A. Likelihood of Success

Campbell contends that there is a substantial likelihood that he will prevail on his claim that the defendants abridged his constitutionally based rights of ballot access by enforcing the new deadline for independent candidate registration only a week after the statute was precleared by the Justice Department. The court agrees.

 Fundamentally, what is at issue in this case is the due-process concept of fair notice, which is central to the legitimacy of our legal system: "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Products,* 511 U.S. 244, 264, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994). In other words, any law that requires you to do something by a certain date must give you adequate time to do it; otherwise, the law would be irrational and arbitrary for compliance with it would be impossible. The question presented here is whether and when that time can be shortened by a later law. There is no

question that if a law initially gives you, for example, 15 months to do something and a later law shortens that period to 14 months (assuming both 14 and 15 months are reasonable), there would be no fair-notice problem if you were notified of the shortened period at the beginning of the 15–to–14–month period; in other words you would have a period of time to adjust or adapt to the shortened period. But if you were given notice of the shortened period at the end of the 14–month period, such that you had no time to adapt to the shortened period, the shortened notice would be irrational and arbitrary, for you would have been given no time to make preparations for the shortened period. Here, the one week that was given to allow state officials to notify candidates and then to allow those candidates, including Campbell, to adjust to, and prepare for, the new law's effective registration date, was more akin to no time in light of the intervening weekend and holiday, and definitely amounted to inadequate time.

While this court has found no precise analogues to the change in deadlines in the case at hand, there is support elsewhere for the notion that changes in the rules of the game must give those affected a reasonable time to comply. *See, e.g., Goodman v. United States*, 151 F.3d 1335, 1337 (11th Cir.1998) (holding that prisoners whose convictions became final before the enactment of AEDPA must be given a one-year grace period in which to file their claims, rather than being subject to AEDPA's general one-year filing period, which would normally begin to run upon the conviction becoming final); *Brothers v. Florence*, 95 N.Y.2d 290, 716 N.Y.S.2d 367, 739 N.E.2d 733 (2000) (holding that it was

unreasonable to apply an amended statute of limitations that shortened the time in which to file medical-malpractice claims to a suit that, upon passage of the new statute of limitations, was to be filed within four months rather than within the significantly longer time under the old statute, given the diligent pursuit of the claim by the plaintiff from the time of accrual); Am.Jur.2d, *Limitations of Actions*, § 48 (2002); *see also* 5 U.S.C.A. § 553 (requiring, for government agencies, that "publication or service of a substantive rule shall be made not less than 30 days before its effective date," unless certain exceptions are met). Adequate notice was not given to Campbell for the registration-deadline change, and, because the right abridged by the lack of notice is also fundamental, that lack of fair notice pushes the application of the new deadline to Campbell into unconstitutional territory.

■ Obviously, the coexisting strand of law that fleshes out Campbell's cause of action is the well-established protection for independent candidate ballot access. "The requirements for an independent's attaining a place on the general ballot can be unconstitutionally severe." *Storer v. Brown*, 415 U.S. 724, 738, 94 S.Ct. 1274, 1283, 39 L.Ed.2d 714 (1974). Specifically, burdensome requirements can abridge the first amendment, by restricting the ability of the people to associate for political purposes, as well as the fourteenth amendment, by restricting access to the ballot for independent political parties or candidates and, correspondingly, by restricting the right to vote in violation of due process and equal protection principles.[3]

The basic analysis required to determine whether an election requirement for inde-

---

**3.** The Supreme Court has described the constitutional basis of challenges to ballot access restrictions, such as this one, as follows:

"The state laws place burdens on two different, though overlapping kinds of rights—

pendent candidates contravenes constitutional standards is set out in *Storer v. Brown:* "[I]n the context of [a State's] politics, could a reasonably diligent independent candidate be expected to satisfy the ... requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" 415 U.S. at 742, 94 S.Ct. at 1285. Stated a bit differently, "the inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." *Anderson v. Celebrezze,* 460 U.S. 780, 793, 103 S.Ct. 1564, 1572, 75 L.Ed.2d 547 (1983).

Alabama's new "sore loser" statute does not, by itself, unconstitutionally burden the right of an independent candidate to appear on the ballot. States obviously are empowered to regulate their election processes in order to prevent that critical aspect of democratic society from degenerating into chaos. *Id.* at 788, 103 S.Ct. at 1569. Although these regulations will necessarily constrict, to some degree, a citizen's right to vote and right to political association, the State's interest in orderly governmental transitions "are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* at 788, 103 S.Ct. at 1570. More particularly, the Supreme Court has recognized the value of a "sore loser" law, in that such a law prevents "splintered parties and unrestrained factionalism," which "may do significant damage to the fabric of government." *Storer,* 415 U.S. at 736, 94 S.Ct. at 1282. Preventing those political candidates who lose in a party primary from re-entering the race as an independent candidate in the general election discourages "independent candidacies prompted by short-range political goals, pique, or personal quarrel." *Id.* at 735, 94 S.Ct. at 1281.

However, even though the State possesses a legitimate reason for its enactment of the "sore loser" law, that does not necessarily mean that its application to Campbell is constitutional, "[f]or even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty.... Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Kusper v. Pontikes,* 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973) (internal citations and quotes omitted). "If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Id.*

The application of the new deadline, without fair notice of the new deadline and coupled with the short time before that new deadline was to expire, is an unnecessarily drastic deprivation of Campbell's fundamental rights that does not serve to advance any corresponding state objec-

the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical effect on voters." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). The locus of these specific rights has been placed in the first and fourteenth amendments, with the Court in early ballot access cases relying on the "fundamental rights" strand of equal-protection analysis, and, in the later cases, relying directly on the first and fourteenth amendments.

tives in the counterbalance. Upon the new statute becoming effective, Campbell, in the space of a moment, lost the last month of the time available for him to collect signatures and support for his candidacy, finding himself with just one week remaining to meet the registration requirements. One week is simply too little time for even a conscientious candidate to adapt his campaign strategy to meet a now-looming deadline with little or no notice, and it is fair to say that, due to the compounded effect of several factors in disseminating the notice of preclearance, Campbell actually had much less than a week's notice to meet the new deadline for independent candidate registration. The Alabama Secretary of State's Office did not receive the preclearance notice until May 29, and, therefore, did not begin sending out a press release until that day. Although Campbell possibly could have searched out the preclearance notification as of May 29, he did not actually learn of it until he caught a newscast on June 2. With the state holiday on June 3, Campbell was unable to obtain confirmation of the changed deadlines. On June 4, of course, the new deadline passed, and it is little wonder that Campbell was unable to do anything significant to meet that deadline.

Even without focusing on the practical aspects of making up for a month's worth of time on short notice, these last days themselves are extremely important to the independent candidate, for both organizational and political reasons. The Supreme Court has articulated the reasons why an independent candidacy often does not begin to organize until later in the season:

> "[W]hen the primary campaigns are far in the future and the election itself is even more remote, the obstacles facing an independent candidate's organizing

efforts are compounded. Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign."

*Anderson*, 460 U.S. at 792, 103 S.Ct. at 1572. Voters become more interested in independent candidates later on because, as the party primaries approach and as the shape of the general election begins to materialize, the main party candidates and their positions on the issues crystallize. Independent candidates can then gain a springboard onto the public radar by basing their position on gaps in the main party platform. An independent candidate in this position often garners support from that segment of the voting population that finds that its particular political agenda will not be advanced by voting for the Democratic or Republican candidate. Cancelling the independent candidate's final month, with little-to-no notice of the change, is therefore a considerable deprivation because it occurs precisely at that time when the candidate would start to gain most of his popular support. A last-minute change in the deadline for signature-gathering would also disproportionately affect the independent candidate during this crucial time period by forcing him to divert volunteer time and other scarce resources to simply gathering signatures rather than campaigning on the issues.

The defendants make much of Campbell's ability to prepare for the preclearance of the new statute by starting his signature campaign earlier. According to them, Campbell could not reasonably rely on the repeated representations made to him by state officials that the deadline for independent candidate registration would be July 1, 2002; rather, he should have been aware that the new statute *could* be

precleared in time for it to be applied to the 2002 election cycle—that is, to be safe, Campbell should have prepared for a *possible* change in the registration deadline. However, elections officials for the State freely admit that they had no idea whether preclearance would occur in time for the new deadline to apply in 2002. And while this court would be comfortable charging Campbell with knowledge of the State's duly and completely enacted laws, this particular piece of legislation, subject to preclearance, did not actually become the executable law of the State until it was precleared on May 28, 2002. *See Lopez v. Monterey County*, 525 U.S. 266, 279, 119 S.Ct. 693, 701, 142 L.Ed.2d 728 (1999) ("Preclearance is required before actually *administering* a change."). It was on that date, at the very earliest, that Campbell can be charged with constructive knowledge of the new deadline. Compounding the inequity of charging Campbell with preparing for this possible change is the fact that state officials failed to communicate effectively the possibility of the change to independent candidates and, indeed, in Campbell's case, affirmatively represented in a variety of contexts and on a range of days that the deadline was July 1, 2002.

The court therefore finds that Alabama, by applying the new deadline so soon after preclearance, overbroadly promotes the purposes of that legislation by failing to provide adequate time for the affected candidates to adjust to the new deadline. Certainly, the State has made no colorable argument that its legitimate interests are in any way more advanced by springing the statute into effect immediately after preclearance, rather than granting those independent candidates affected by the deadline some sort of grace period in which to comply with the new require-ments or waiting until the next election cycle to strictly enforce the new deadlines. The shortened period of time given to Campbell to register for the ballot was patently unfair. Accordingly, Campbell does have a substantial chance of prevailing on the merits of his claim, satisfying the first requirement for the issuance of a preliminary injunction.

### B. Irreparable Harm

■ The second requirement for the issuance of a preliminary injunction is that the plaintiff would otherwise suffer irreparable harm. The court has above described the injury to Campbell as considerable, and as affecting several fundamental constitutional rights. Obviously, there is no adequate remedy of law for the injury of being denied placement on the ballot for the elections this fall.

### C. Weighing of Injuries

A balancing of the present injury to the plaintiff and the hardship incurred by the defendant from the issuance of the injunction is the third component of the preliminary injunction analysis. An injunction in this case will not create any arduous obligations for the State; rather, the remedy requested is simply the addition of Campbell's name on the list certified by the Secretary of State for inclusion on the ballot for the general election. Balancing this light hardship versus the injury to Campbell's fundamental rights militates strongly in favor of granting a preliminary injunction.

### D. Public Interest

The court also finds that Campbell has satisfied the fourth, and final, requirement for preliminary injunctive relief, that the action would not be adverse to the public interest. The constitutional violations de-

scribed herein touch upon the public's general right of political association and right to vote, and the preservation of such rights through injunctive relief is not contrary to the public interest.

## III. CONCLUSION

It should be clear that the court is not saying that the Alabama statute itself is unconstitutional. Rather, the problem with the statute is not its content, but the manner in which it was promulgated without sufficient notice to those affected by its terms.

For the foregoing reasons, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Plaintiff Ray Campbell's motion for preliminary injunction, filed July 31, 2002 (Doc. no. 5), is granted.

(2) Defendants James Bennett, William Pryor, Richard I. Proctor, and Casandra Horsley, and their officers, agents, servants, employees, and those person in active participation with them who receive actual notice of this order, are PRELIMINARILY ENJOINED and RESTRAINED from failing to take immediate affirmative steps to place plaintiff Campbell's name on the ballot for the District 7 seat in the Alabama House of Representatives.

## APPENDIX A

Prior to the passage of Act No. 2001–1131, § 17–7–1 of the 1975 Alabama Code provided, in relevant part:

"(a) The following persons shall be entitled to have their names printed on the appropriate ballot for the general election, provided they are otherwise qualified for the office they seek:

. . . . .

(2) All candidates who have been put in nomination by any caucus, convention, mass meeting, or other assembly of any political party or faction and certified in writing by the chair and secretary of the nominating caucus, convention, mass meeting, or assembly and filed with the probate judge, in the case of a candidate for county office, and the Secretary of State in all other cases, on or before 5:00 P.M. six days after the second primary election.

(3) Each candidate who has been requested to be an independent candidate for a specified office by written petition signed by electors qualified to vote in the election to fill the office when the petition has been filed with the probate judge, in the case of a county office and with the Secretary of State in all other cases, on or before 5:00 P.M. six days after the second primary election. . . .

. . . . .

"(c) . . . The probate judge is prohibited from causing to be printed on the ballot the name of any independent candidate who was a candidate in the primary election of that year."

## APPENDIX B

After the passage of Act No. 2001–1131, § 17–7–1 provided, in relevant part:

"(a) The following persons shall be entitled to have their names printed on the appropriate ballot for the general election, provided they are otherwise qualified for the office they seek:

. . . . .

(2) All candidates who have been put in nomination by any caucus, convention,

mass meeting, or other assembly of any political party or faction and certified in writing by the chair and secretary of the nominating caucus, convention, mass meeting, or assembly and filed with the probate judge, in the case of a candidate for county office, and the Secretary of State in all other cases, on or before 5:00 P.M. on the date of the first primary election as provided for in Section 17–16–6, Code of Alabama before the first primary election.

(3) Each candidate who has been requested to be an independent candidate for a specified office by written petition signed by electors qualified to vote in the election to fill the office when the petition has been filed with the probate judge, in the case of a county office and with the Secretary of State in all other cases, on or before 5:00 P.M. on the date of the first primary election as provided for in Section 17–16–6, Code of Alabama. . . .

. . . . .

"(c) . . . The probate judge is prohibited from causing to be printed on the ballot the name of any independent candidate who was a candidate in the primary election of that year and the name of any nominee of a political party who was a candidate for the nomination of a different political party in the primary election of that year."