Johnny SWANSON, III,
et al., Plaintiffs,

v.

Jim BENNETT, etc., et al., Defendants.

No. Civ.A. 02–T–644–N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 30, 2002.

---

Arlene M. Richardson, T. Allen French, Richardson & French, Hayneville, AL,

David Schoen, Montgomery, AL, for plaintiffs.

John J. Park, Jr., Office of the Attorney General, Montgomery, AL, Charles E. Grainger, Jr., Asst., Atty. General, Alabama Secretary of State's Office, Montgomery, AL, for defendants.

Don Seigelman, Alabama State Capitol, Montgomery, AL, pro se.

## PRELIMINARY INJUNCTION

MYRON H. THOMPSON, District Judge.

In this lawsuit, plaintiffs Johnny Swanson, III, Joseph Grimsley, and Frank Cobb challenge two election requirements: (1) a change in the deadline for independent candidate registration effected by a new Alabama statute; and (2) Alabama's requirement that independent candidates running for a non-Presidential office collect signatures in an amount equal to 3% of the qualified electors who voted for governor in the last general election in the political subdivision in which the candidate seeks to be placed on the ballot.[1] The named defendants include the Secretary of State, the State Attorney General, and two Alabama probate judges. The plaintiffs' challenge is based on the first and the fourteenth amendments to the United States Constitution as enforced through 42 U.S.C.A. § 1983. The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. § 1331.

Currently before the court is the plaintiffs' motion *for* a preliminary injunction requiring the defendants to place their names on the ballot. For the reasons stated below, the court will require that the defendants place Grimsley's and

Cobb's, but not Swanson's, names on the ballot.

## I. BACKGROUND

The relevant facts are as follows:

*April 3, 2001:* Swanson began his campaign for United States Senator from Alabama and consulted with the Alabama Secretary of State's Office and the Code of Alabama about the requirements for getting on the ballot. At that time, Alabama law required that, to have his name placed on the ballot, he submit 39,536 signatures by July 1, 2002, and Swanson so understood the law.

*December 28, 2001:* The Governor of Alabama signed Act No. 2001–1131, which amended the "sore loser" statute by, among other things, moving the deadline for independent candidate registration (that is, the candidate's filing of a petition signed by the statutorily required number of voters) from six days after the second primary election (which would have been July 1, for the 2002 election cycle) to the date of the first primary election (which was June 4, for the 2002 election cycle). 1975 Alabama Code § 17–7–1.[2] The Act did not change the 3% signature requirement. According to its text, the Act would become effective "immediately upon its passage and approval by the Governor, or its otherwise becoming law." Because changes to Alabama's voting processes must be precleared by the United States Justice Department, the law did not immediately go into effect.

*January 2002:* The State published a State Election Handbook, which listed the deadline for independent candidate regis-

---

1. The Independent Democrats (Alabama) is also a plaintiff in this case. However, because this is Swanson's independent party, the court has considered the two as one for purposes of this order.

2. For the text of § 17–7–1 of the 1975 Alabama Code prior to and after passage of Act No. 2001–1131, see the appendices to *Campbell v. Bennett*, 212 F.Supp.2d 1339 (M.D.Ala. 2002).

tration as July 1, 2002. The handbook described Act No. 2001–1131, but described it as being subject to Justice Department approval. No timetable for preclearance of the statute was given, and the Secretary of State's office admitted that it could not give prospective candidates any idea whether the act would be precleared in time for the 2002 election cycle, and, accordingly, whether the new deadline would be effective. At this point in time, Swanson had turned in 7,903 signatures, and 5,226 of those had been verified by the Secretary of State's Office.

*March 29, 2002:* Act No. 2001–1131 was submitted for preclearance. The United States Department of Justice had 60 days from this date to respond to the preclearance request by either preclearing the statute or by registering objections. If no answer was received within 60 days, then the statute would be automatically precleared.

*April 5, 2002:* Swanson learned, for the first time, about Act 2001–1131 from a probate judge. He discussed the issue with the Secretary of State's Office and learned the law had been submitted to the Justice Department for preclearance.

*April 10, 2002:* After receiving an election package and Election Handbook from the Secretary of State's Office, which listed the petition deadline as July 1, 2002, Cobb began his campaign for Representative to the State House. Cobb began gathering the 377 signatures he needed to be listed on the ballot. Grimsley also began his campaign for Sheriff of Barbour County in the early spring and began gathering his signatures.

*May 26, 2002:* Swanson was told by the Alabama Attorney General's Office and the Secretary of State's Office that, even if Act 2001–1131 were precleared, it would not be implemented until the 2004 election cycle.

*May 28, 2002:* The Department of Justice precleared Act No. 2001–1131, and

informed the State Attorney General's Office by letter. Swanson was informed that the Act had been precleared by the Secretary of the State's Office and that his petition was now due on June 4, 2002.

*May 29, 2002:* The Secretary of State's Office issued a press release to the general public as well as a mass mailing to all the probate judges informing them of preclearance and of the new deadline's applicability.

*June 1 and 2, 2002:* This was a weekend.

*June 3, 2002:* This was a state holiday.

*June 4, 2002:* The new independent candidate registration deadline arrived exactly a week (including a weekend and a holiday) after the Act No. 2001–1131 went into effect. As he was collecting signatures at the county polling place, Grimsley learned of the new deadline for independent candidate registration from a probate judge. However, Grimsley did not believe he had enough signatures to meet the threshold requirement and did not file his petition that day. Two other independent candidates, Tracy Larkin and Jimmy Blake met the new deadline, and submitted enough signatures to gain access to the ballot. Larkin was called by an employee of the Secretary of State and personally informed of the deadline a day or two after the Act's preclearance.

*June 7, 2002:* Cobb called the Secretary of State's Office on an unrelated question and was informed that the deadline for filing his petition had passed and was June 4, 2002.

*July 1, 2002:* Cobb and Grimsley attempted to file their signature petitions. Both had the statutory required number of valid signatures to have gained access to the ballot. Nevertheless, they were told that their petitions would not be certified absent a court order. Swanson submitted an additional 3,010 signatures to be veri-

fied; however, even if all those signatures were verified, he still did not meet the signature requirement.

## II. DISCUSSION

Whether to issue a preliminary injunction lies within the sound discretion of the district court. *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir.1990). The Eleventh Circuit Court of Appeals has established a four-prong test for the district court to apply when determining whether a preliminary injunction should issue. Under this test, the movant must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir.2002).

### A. Likelihood of Success

#### 1. Challenge to Change in Independent Candidate Registration Date

■ The plaintiffs contend that there is a substantial likelihood that they will prevail on their claim that the defendants abridged their constitutionally-based rights of ballot access by enforcing the new deadline for independent candidate registration only a week after the statute was precleared by the Justice Department. As previously stated in great detail, *Campbell v. Bennett*, 212 F.Supp.2d 1339 (M.D.Ala.2002), this court agrees.

In *Campbell*, this court was faced with the same question presented here, when Campbell, an independent candidate for office in Alabama, was adversely affected by the same abrupt change in the registra-tion deadline. This court noted two overlapping constitutional deprivations in that case: first, a violation of the "due process concept of fair notice," *id.* at 1343–44, and second, a violation of the "well-established protection for independent candidate ballot access." *Id.* at 1344–45.

First, the court noted the importance of notice to the "legitimacy of our legal system: 'Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.'" *Id.* at 1343–44 (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 264, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994)). The court held that due process concept of fair requires that any law requiring that something be done by a certain date must afford adequate time in which to do it. *Id.* The court explained that "the one week that was given to allow state officials to notify candidates and then to allow those candidates, including Campbell, to adjust to, and prepare for, the new law's effective registration date, was more akin to no time in light of the intervening weekend and holiday, and definitely amounted to inadequate time." *Id.*

In this case, both Grimsley and Cobb expected to have until July 1 to meet the registration deadline. When the deadline was changed to the earlier date, they were given no notice of the new date. Grimsley testified that he learned of the new deadline on the day the petitions were due, and Cobb was unaware of the law until three days after the deadline passed, which obviously precluded any chance he had of complying with the law.[3] This sudden change

---

**3.** The defendants argue that Grimsley had enough time to file his petition since he learned of the new date on the actual day of the deadline. The court rejects this argument. The State's obligation to give adequate notice was not satisfied when, by happen-stance, a probate judge saw Grimsley and informed him of the new deadline hours before his petition was due. Notice requires giving those affected by a rule change a *reasonable* time to comply. *Campbell*, 212 F.Supp.2d at 1343–44. A few hours does not

by the State cuts to the heart of what the concept of fair notice means: when the rules of the game are altered, those affected must be given a reasonable opportunity to comply. No reasonable notice was given in this case.

The second effect of the immediate enforcement of Act. No.2001–1131 is the violation of the plaintiffs' constitutional right to access the ballot. As this court stated in *Campbell*, burdensome requirements on an independent candidate's right to ballot access "can abridge the first amendment, by restricting the ability of the people to associate for political purposes, as well as the fourteenth amendment, by restricting access to the ballot for independent political parties or candidates and, correspondingly, by restricting the right to vote in violation of due process and equal protection principles." *Campbell*, 212 F.Supp.2d at 1344–45 (footnote omitted).

There is no question that this sudden change in the registration deadline for independent candidates amounts to a burdensome requirement to obtain ballot access. "[T]he inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." *Anderson v. Celebrezze*, 460 U.S. 780, 793, 103 S.Ct. 1564, 1572, 75 L.Ed.2d 547 (1983).

While Alabama's new "sore loser" statute does not, by itself, unconstitutionally burden the right of an independent candidate to appear on the ballot, *see Campbell*, 212 F.Supp.2d at 1345–46, its application to the plaintiffs is unconstitutional. "For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973) (internal citations omitted).

The court in *Campbell* explained how depriving an independent candidate of a month of time to collect signatures with just one week's notice dramatically affects a candidates campaign and deprives him of his fundamental rights. 212 F.Supp.2d at 1345–47. This same reasoning applies to the campaigns of both Cobb and Grimsley. Further, as in *Campbell*, the State has failed to articulate an adequate reason for applying the new deadline to the current election cycle instead of delaying its applicability or granting candidates such as Cobb and Grimsley a grace period for compliance. *Id.* at 1347–48.

In short, this court applies the reasoning of *Campbell*, which found "the shortened period of time given to Campbell to register for the ballot was patently unfair," to the claims by Cobb and Grimsley. *Id.*

constitute a reasonable amount of time to comply (including time to confirm that the new information he had received was accurate) when Grimsley believed he still had a month remaining before the deadline.

The defendants further emphasize that as many as two independent candidates were able to meet the June 4 deadline. This argument misses the point. To be sure, there apparently were other independent candidates who were able to gather their signatures early enough or quickly enough to meet the changed deadline. The problem, however, is that, up until May 28, state law invited independent candidates to wait until as late as they wanted to gather or to begin gathering

signatures as long as they met the July 1 deadline. It is this change in the rule, without adequate time for all reasonably diligent *independent candidates who relied on it* to adjust, that is constitutionally infirm. Indeed, Larkin, who was able to gather his signatures over the weekend before June 4, is a well-known public personality; he has hosted television news shows and radio entertainment shows, and is currently a City of Montgomery council member. It is apparent that he was able to gather his signatures so quickly because of his name recognition. An independent candidate should not have to be a well-known public personality in order to meet the changed deadline.

This leads to the obvious conclusion that Cobb and Grimsley have a substantial chance of prevailing on the merits of their claim, satisfying the first requirement for the issuance of a preliminary injunction.

■ However, because Swanson never collected enough signatures to satisfy the 3% signature threshold requirement, and because, as explained below, he is now unlikely to prevail on his challenge to this threshold, the court need not address his challenge to the registration deadline change, for he is not entitled to have his name placed on the ballot anyway.

### 2. Challenge to the 3% Signature Threshold

■ The plaintiffs also contend that there is a substantial likelihood that they will prevail on their claim that the defendants abridged their constitutionally-based right of ballot access by requiring them to collect signatures of 3% of the qualified electors who voted for governor in the last general election in the political subdivision in which the candidate seeks to be placed on the ballot. Because Cobb and Grimsley obtained the required number of signatures, this claim is moot as to them. The court will therefore address this claim as to Swanson only.

It is settled law that there is an "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *see also Libertarian Party of Fla. v. State of Fla.*, 710 F.2d 790, 792–93 (1983) (collecting other Supreme Court cases that affirm the State's interest in regulating the election process). Swanson does not challenge this proposition, but argues that Alabama has chosen an unreasonable method to further this interest, and that a less restrictive alternative exists

that would sufficiently protect the State's interest. Thus, this court must assess whether the 3% requirement is a reasonable method for Alabama to employ or whether it puts an unreasonable burden on independent candidates.

The court begins its analysis by noting two Supreme Court cases in which 5% signature requirements were upheld against challenges similar to those the plaintiffs make in this case. In *Jenness*, the Supreme Court determined that a Georgia law requiring an independent candidate to file a nomination petition in June, signed by 5% of the total number of voters in the last election for the office the candidate was contesting, was constitutional. In *Storer v. Brown*, 415 U.S. 724, 738, 94 S.Ct. 1274, 39 L.Ed.2d 714, S.Ct. 1274, 1283 (1974), the Court held a similar requirement in California was "not excessive," although the Court remanded the case to determine whether the percentage was actually 5% or a higher percentage. These cases demonstrate the Supreme Court's judgment that a 5% signature requirement is facially constitutional.

Similarly, the Eleventh Circuit Court of Appeals has provided guidance on this issue. In *Libertarian Party of Fla. v. Fla.*, 710 F.2d 790 (1983), the court upheld a challenge to Florida's 3% signature requirement and stated:

> "[A]ny percentage or numerical requirement is 'necessarily arbitrary.' Once a percentage or number of signatures is established it would probably be impossible to defend it as either compelled or least drastic ... Thus the test, is whether the legislative requirement is a rational way to meet this compelling state interest. The least drastic means test becomes one of reasonableness, i.e., whether the statute unreasonably encroaches on ballot access."

710 F.2d at 793 (internal citations omitted). In light of the decisions in *Jenness, Storer* and *Libertarian Party,* this court cannot find that the 3% Alabama requirement is likely to be found unconstitutional.

*Libertarian Party* in particular, cautions courts against fine-tuning numerical requirements set by the State to a less restrictive standard, even when a less restrictive standard exists that protects the State's interest, without a showing that the requirement is unreasonable. *Libertarian Party,* 710 F.2d at 793. Without some compelling evidence from Swanson, this court is constrained to hold a 3% requirement is reasonable as *Jenness, Storer* and *Libertarian Party* determined. Swanson argues that, in the time between those cases and this case, obtaining signatures has become even harder for independent candidates. As one example, he cites the earlier deadline imposed by Alabama to register signatures. As another example, he cites changed circumstances in society that make it harder to command voters' attention and obtain their signatures. While the court is sympathetic to these arguments, these changes are not substantial enough to warrant a different conclusion; nor do they speak to the specific factors that the Eleventh Circuit considered in *Libertarian Party* when holding the Florida 3% requirement reasonable.

The Eleventh Circuit cited eight factors present in the Florida law that eased the burden of obtaining signatures. The factors cited were: allowing voters to sign the petition regardless of party affiliation; allowing voters who already voted in a primary to sign the petition; allowing voters to sign more than one independent candidate's petition; lack of restrictions on how many signatures were allowed from a specific geographical area; lack of restrictions on how many signatures could be submitted in the effort to meet the 3% requirement; allowing sufficient time to conduct the petitioning effort (188 days); the ability of minor political parties to qualify for the ballot in the past; and the cost required was not impermissibly burdensome. *Libertarian Party,* 710 F.2d at 794.

These alleviating factors are present in the Alabama statute mandating the 3% requirement. The statute does not restrict voters from signing petitions based on their party affiliation, nor does it restrict voters who have already voted in a primary from signing the petition. Independent candidates can seek signatures from voters who have already signed other petitions, and there are no restrictions on how many signatures may come from a specific geographical area. Alabama does not restrict how many signatures can be submitted in an effort to meet the 3% requirement, and the state allows unlimited time to conduct the petitioning effort. *See* Code of Alabama § 17–7–1(a)(3) (1975). Additionally, testimony at the hearing established that another independent party, the Libertarian Party, has recently gained access to the ballot. The testimony also established that, while there are costs in obtaining signatures, these costs are not imposed by the State itself and are not unduly burdensome.[4]

Swanson also argues that the Alabama law is unreasonable because it requires more signatures for independent candidate registration than almost every other State. Again, the court is sympathetic to this argument, but cannot hold the Alabama

---

4. In *Libertarian Party,* the Eleventh Circuit upheld the Florida statutory requirement that independent candidates pay ten cents for each signature they wanted verified to defray the cost of verification. No such requirement exists in the Alabama law, and while signatures may be expensive to obtain as plaintiffs' experts testified, these costs are not imposed by the State. *Libertarian Party,* 710 F.2d at 794–95.

law unconstitutional based on the fact that it is more restrictive than the laws of its sister states. As stated in *Libertarian Party,* "a court is no more free to impose the legislative judgment of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." 710 F.2d at 794 (internal citations omitted).

Swanson has attempted to demonstrate that the 3% requirement is not the least restrictive method that the legislature could employ to protect its interest, and is unreasonable. However, from *Jenness* to *Storer* to *Libertarian Party,* the Supreme Court and the Eleventh Circuit have consistently upheld statutes similar to or more burdensome than the Alabama statute. Additionally, all of the factors present in *Libertarian Party* that militate against finding a signature threshold unreasonably burdensome are also present in the Alabama statute. There are no differences in these cases that Swanson can point to other than the passage of time. No compelling evidence has been presented to the court to distinguish this case from *Libertarian Party.*

Swanson has directed this court's attention to language in *Bergland v. Harris,* 767 F.2d 1551 (1985), which suggests that a different balancing test for "weighing the state interests against the burdens placed on candidates for statewide and local offices" may be required for federal offices. *Id.* at 1554. While United State Senators are federal officials, this case does not affect state requirements regarding their office. Rather, it stands for the proposition that offices, such as the Presidency, in which "the outcome ... will be largely determined by voters beyond the State's boundaries," must be judged by a different standard, because those candidates must satisfy the ballot restrictions in other States. *Id.* This limited definition of "federal office" is further supported by *McCrary v. Poythress,* 638 F.2d 1308, 1314, n. 5 (5th Cir.1981), the case on which *Bergland* relies to differentiate the standards that courts must use to evaluate the restrictions placed on "federal" versus "state" offices. *McCrary* states that:

> "We are not confronted with the burdens faced by independent or third party Presidential candidates who encounter widely varying restrictions on access to state ballots in the course of the extended Presidential campaign season. Several factors peculiar to our only nationwide election would then have to be considered in balancing the state's interest in reasonable ballot control against the candidate's right of access."

*Id.* While United States Senators hold federal office, they are not elected by national elections, and the ballot restrictions placed on the office do not require analysis under the different standard referred to in *McCrary* or *Bergland.*

■ Although not pursued during the hearing, Swanson also argued in his preliminary-injunction motion that the 3% signature requirement violates the qualifications clause of the Constitution. U.S. Const.Art. I, § 3, cl. 3. The court unequivocally rejects this argument, as the Supreme Court has done so twice, in *Storer v. Brown,* 415 U.S. 724, 746, 94 S.Ct. 1274, 1287, 39 L.Ed.2d 714 (1974), and *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 835, 115 S.Ct. 1842, 1870, 131 L.Ed.2d 881 (1995).

For the following reasons, the court holds Swanson has not shown a likelihood of success on the merits of his claim that Alabama's 3% signature requirement is unconstitutional.

### B. Irreparable Harm

■ As for Cobb and Grimsley, who have illustrated a likelihood of success on the merits of the plaintiffs' first claim, they

must also demonstrate that without the injunction they would otherwise suffer irreparable harm. The court has above described the injury to Cobb and Grimsley as considerable, and as affecting several fundamental constitutional rights. Obviously, there is no adequate remedy of law for the injury of being denied placement on the ballot for the elections this fall.

### C. Weighing of Injuries

A balancing of the present injury to Cobb and Grimsley, and the hardship incurred by the defendants from the issuance of the injunction is the third component of the preliminary injunction analysis. An injunction in this case will not create any arduous obligations for the State; rather, the remedy requested is simply the addition of Cobb's and Grimsley's names on the list certified by the Secretary of State for inclusion on the ballot for the general election. Balancing this light hardship against the injury to Cobb's and Grimsley's fundamental rights weighs strongly in favor of granting a preliminary injunction.

### D. Public Interest

The court also finds that Cobb and Grimsley have satisfied the fourth, and final, requirement for preliminary injunctive relief, that the action would not be adverse to the public interest. The constitutional violations described herein touch upon the public's general right of political association and right to vote, and the preservation of such rights through injunctive relief is not contrary to the public interest.

### III. CONCLUSION

It should be clear that the court is not saying that the Alabama statute itself is unconstitutional. Rather, the problem with the statute is not its content, but the manner in which it was promulgated without sufficient notice to those affected by its terms.

For the foregoing reasons, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Plaintiffs Johnny Swanson, III, Independent Democrats (Alabama), Frank Cobb, and Joseph Grimsley's motion for preliminary injunction, filed August 9, 2002, (Doc. no. 41), is granted as to plaintiffs Cobb and Grimsley and is denied as to plaintiffs Swanson and Independent Democrats (Alabama).

(2) The defendants are PRELIMINARILY ENJOINED and RESTRAINED from failing to take immediate affirmative steps to place Frank Cobb's name on the ballot for the District 40 seat in the Alabama House of Representatives, and to place Joseph Grimsley's name on the ballot for Sheriff of Barbour County.

The clerk of the court is DIRECTED to issue a writ of injunction.